Argued and submitted September 20, 1994, remanded with instructions January 25, petition for review denied April 25, 1995 (321 Or 94)

In the Matter of the Marriage of

Ellen Peters HOLCOMB,
*Appellant,*
*and*

Michael Lee HOLCOMB,
*Respondent.*

(15-92-08338; CA A80748)

888 P2d 1046

Joel S. DeVore argued the cause for appellant. With him on the brief was Luvaas, Cobb, Richards & Fraser, P.C.

D. Michael Wells argued the cause for respondent. With him on the brief was Hutchinson, Anderson, Cox & Coons, P.C.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

LANDAU, J.

## LANDAU, J.

Mother appeals a dissolution judgment in which the trial court granted custody of the parties' 19-month-old child to father. We reverse.

Mother is 26 years old, and father is 34. The parties were married slightly less than two years. Mother has two college degrees and plans to complete a Ph.D. in marketing. Father has a Ph.D. and works as a toxicologist. While they were married, the parties lived in Corvallis. Father worked in Eugene and commuted to and from work each day. Mother worked full time in Corvallis. When the child was born, mother stayed home for six weeks and then returned to work part time. Mother took primary care of the child, including arranging day care and leaving work to visit and to breast-feed the child. The child was ill much of the time. Mother missed more than three weeks of work because of the child's illnesses and, ultimately, quit work altogether because of the child's health in order to care for the child on a full-time basis.

Father spent little time caring for the child. He went to the doctor with mother and the child once. He occasionally changed diapers. He also attempted to bottle feed the child, but the child preferred to be breast-fed. Father never bathed the child. He did other work around the house, but he testified that, because of his two-hour daily commute, he was often tired at the end of the day and did not do more.

The parties' relationship soon disintegrated. Mother wanted to complete her education at Northwestern University in Illinois. She says that she and father discussed this, agreed to it and sent away for application material together. Father denies that any such discussions took place. Mother says that, when she took steps to follow through on those plans, father threatened to "get her." Father denies ever saying that. Mother asserts that father verbally and physically abused her, that he grabbed her and dragged her across the floor, that he threw drawers, toys and other objects, and that, on one occasion, he grabbed mother's purse out from under the child while she was nursing, all of which frightened the child. Mother kept a diary that shows a pattern of father's fits of temper occurring about every two weeks. She says that when she and father had disagreements, it visibly upset the

child, who would often cry. Father denies any sort of abusive behavior.

Mother left home with the child to live in a women's shelter and did not return until father no longer lived there. She obtained a restraining order requiring father's visits with the child to be supervised and requiring him to stay away from mother entirely. Father refused to visit the child on a supervised basis. Ultimately the parties agreed to unsupervised visits, and father did visit the child regularly. Meanwhile, mother petitioned for dissolution and requested custody of the child. Mother intended to take the child with her to Illinois, where she had been offered a full scholarship, plus a stipend, to complete her education at the Kellogg School of Management at Northwestern University.

The parties selected a mutually agreeable evaluator who found no psychiatric reason why either could not be a custodial parent. However, the expert chose mother as the custodial parent because she is more nurturing, more "educative," more likely to foster the child's relationship with both parents, is the primary parent, is breast-feeding the child and, thus, it would cause a more traumatic upheaval to give custody to father. The expert found that mother's relationship with the child is more animated, relaxed, has greater physical contact, is more reinforcing and that mother is better able to forecast the child's needs. The expert found father, although a loving parent, is "highly defended," "quite critical and judgmental," more cautious, conservative, less flexible, and more restrictive and anxious with the child. The expert found that the child "was more regressed, more tentative, tended to be less creative in her play when she was in proximity to her father."

The trial court awarded custody to father. In a letter opinion, the trial court expressed disapproval of mother's plans to attend graduate school in Illinois. According to the trial court, those plans demonstrate that she is concerned only with her own best interests, to the exclusion of father's interests in having a relationship with the child. The trial court acknowledged that the fact that mother was breast-feeding the child at the time presented a "serious obstacle." Nevertheless, it concluded that "[t]hat circumstance is [mother's] doing, not the court's." According to the trial

court, mother's continued breast-feeding of the child simply represented "a further example of her single-minded eagerness to pursue her own interests irrespective of their impact on the child and [father]."

Mother immediately moved to reopen the record. In an affidavit to the court, she testified that she was willing to forgo any educational opportunities in Illinois and that she feared for the child's welfare if father is awarded custody. The trial court denied the motion with the following comment:

> "The Court hereby recuses [itself] from all further matters in this case. This Court has lost confidence in [father]. He is not as wholeheartedly interested in maximizing the child's time with her mother as the Court believed from his trial testimony. The Court has lost confidence in [mother]. The Court believed her testimony that her life's ambition was to obtain a Ph.D. * * * Should she be awarded custody nothing[,] it is presumed, would prevent her from enrolling at the Kellogg School in [the] fall of 1994. For these reasons, the Court feels it can no longer hear matters on their merits in this case."

The court then entered the dissolution judgment awarding father custody.

Mother appeals, assigning error to the trial court's failure to award her custody of the child and to its failure to reopen the case before entering the final dissolution judgment.

■■ We review the dissolution judgment *de novo*. ORS 19.125(3). We understand that the decision of the trial court in child custody cases is considered persuasive. *Smith and Smith*, 290 Or 567, 572, 624 P2d 114 (1981). Nevertheless, it does not bind us. As we said in *Sleight and Cazone*, 100 Or App 325, 328, 786 P2d 202 (1990):

> "Our duty is to examine the evidence in the record and reach our own conclusions as to what is in the best interests of the child."

Moreover, in this case, the trial court did not make any findings concerning the best interests of the child to which we may give deference. The trial court's initial decision was predicated not on findings about the interests of the child, but

rather on its apparent disdain for mother's educational ambitions and on her continued breast feeding of the child. In addition, the trial court later washed its hands of both parties upon ruling on mother's motion to reopen.

■■ ORS 107.137(1) establishes "the best interests and welfare of the child" as the benchmark for deciding child custody. We may consider the following factors in determining what is in the best interests of the child:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship; and

"(d) The abuse of one parent by the other." ORS 107.137(1).

No one of those factors is dispositive. ORS 107.137(2).

We conclude that, applying the relevant statutory factors, it is in the best interests of the child to be in the custody of mother.

■■ We begin with the "emotional ties between the child and other family members." ORS 107.137(1)(a). In weighing the evidence concerning this factor,

> "we can consider evidence that one parent has been the primary caretaker or is the more nurturing parent. * * * [A]ll other things being equal, small children should go with the caretaking and more nurturing parent." *Boldt and Boldt*, 104 Or App 379, 382, 801 P2d 874 (1990). (Citations omitted.)

The "primary caretaker" or "primary parent" usually is the one who spends most of the time meeting the child's daily needs. *Derby and Derby*, 31 Or App 803, 806-07, 571 P2d 562, *mod on other grounds* 31 Or App 1333, 572 P2d 1080 (1977), *rev den* 281 Or 323 (1978). *Tuttle and Tuttle*, 62 Or App 281, 660 P2d 196 (1983), is especially instructive on that factor. In that case, both parents were found competent, loving, and loved by the children. The mother, however, was the primary parent and had custody during the separation. When the mother wanted to move out of state with her fiance, the trial

court awarded custody to the father. We reversed, and awarded custody to the mother because the trial court gave insufficient weight to her role as primary parent and omitted the bond between the mother and the children since the separation. We found that those factors outweighed the potential disruption of the out-of-state move. 62 Or App at 285-87.

In this case, the record similarly shows that mother was the child's primary parent. Mother stayed home and cared for the child for the first six weeks after the birth, while father worked. When mother returned to work, it was she who made arrangements for day care, and it was she who took breaks from work each day to visit the child and to breast-feed her. When the child became sick, it was mother who left work to attend to the child's needs. Only once did father go with the child and mother to the doctor. Mother, in fact, missed more than three weeks of work to care for the child during her illnesses. Ultimately, mother gave up her job entirely, in order to care for the child on a full-time basis.

Father testified only that he occasionally changed the child's diapers and that he unsuccessfully attempted to bottle feed her. He also emphasized that he cooked, did laundry, mowed the lawn and performed many other household duties. The point, however, is not whether father carried his share of the household chores. It is, instead, the nature of his emotional ties with the child and whether he may fairly be characterized as the primary parent.

Expert testimony sheds important light on the nature of the emotional ties between the child and her parents. The expert, who was jointly selected by both mother and father to testify about custody, concluded that it was in the best interests of the child for mother to be awarded custody. According to the expert, mother is the child's "primary object relation" and is "very attached to her mother." The expert further testified that, to substantially alter mother's relationship with the child

"would have a disastrous effect. I mean, at this point [mother] is still on occasion nursing [the child]. Whether one would argue that she needs to nurse [the child] or not, it's clear that by her description and just based on some observations that I had of [the child] that this is a very comforting

and reassuring activity and is probably used to dissipate certain stressful times.

"I see that it's a very close and loving relationship, and I think that you would have a major rupture and enoromous grief separation by terminating that relationship."

The evidence concerning the first factor, therefore, weighs heavily in favor of awarding custody to mother.

We next examine "[t]he interest of the parties in and attitude toward the child." ORS 107.137(1)(b). Both parents obviously have an interest in continuing their relationships with the child. It is likewise clear from the record that both parents love the child. Their attitudes towards the child, however, are quite different. Once again, the testimony of the expert focuses directly on the issue. He described father as "extremely cautious," "critical" and "judgmental" and concluded:

"In terms of parental competencies, I would certainly make a judgment that both parents are judged to be competent, that I judge [mother] as in relationship to the two of them as being more animated, more relaxed, greater physical contact, tends to be more reinforcing and is more educative in her relationship to [the child] than [father] is; that in terms of the observations of [the child] with her two parents, it was my judgment that [the child] was more regressed, more tentative, tended to be less creative in her play when she was in proximity with her father.

"It was my judgment that [mother] created more appropriate boundaries in her relationship. She could set limits on [the child] in ways that were not invasive, tended to be — tended to redirect activity that was not punitive but was effective.

"My judgment was that [father] tended to be more restrictive and anxious in his demeanor with [the child]."

Father argues that mother's attitude toward the child is suspect, because her behavior shows that "[m]other's first priority was her career, not her daughter." Father takes particular exception to mother's decision to move to Illinois with the child and to accept the full scholarship, which would take the child away from any sustained, close contact with father. We are not persuaded.

Although close proximity to parents certainly is an important consideration, it is not to be relied on to the exclusion of all other considerations. *Gautier and Gautier*, 58 Or App 510, 515, 648 P2d 1308, *rev den* 293 Or 653 (1982). As we said in *Sleight and Cazone, supra:*

> "Every move of significant distance necessarily disrupts the visitation *status quo*. Nevertheless, moving can be in a child's best interests despite changes, even radical ones, in visitation." 100 Or App at 329. *See also Ditto and Ditto*, 52 Or App 609, 614-15, 628 P2d 777, *rev den* 291 Or 504 (1981).

In this case, the parties' expert considered the impact of moving the child with mother to Illinois and still asserted that mother should be awarded custody. According to the expert, it would be far more traumatic for the child to be separated from mother than for her to be separated from father.

In addition, father's behavior reflects an attitude toward the child that is less than nurturing. Father appears to view the child as something of a tool with which to obtain an advantage against mother. For example, when he was allowed only supervised visitation, father refused to visit the child at all. Apparently, if father could not see the child on his own terms, he preferred to not see the child at all. In addition, the testimony shows that father has difficulty controlling his anger, and that he acts on that anger in physical ways without taking into account the fact that the child may be present and adversely affected by that behavior. Yelling at mother and throwing drawers and other objects while the child is in the room, for example, does not reflect a healthy, nurturing attitude towards the child. To the contrary, it is consistent with the expert's concerns that father is "highly defended," critical and inflexible. The evidence concerning the second factor weighs substantially in favor of granting custody to mother.

We next evaluate the "desirability of continuing an existing relationship." ORS 107.137(1)(c). We generally make every effort to maintain the continuity of relationships already established between a parent and a child. *Ellenwood and Ellenwood*, 20 Or App 486, 490, 532 P2d 259 (1975). In this case, both parents have a relationship with the child, and she will be negatively affected by separation from either of them. However, the expert testified that it would be far more

traumatic for the child to leave mother, because she is the primary caregiver. The continuity of a relationship is more beneficial to the best interests and welfare of the child than continuity of house and town. Thus, the evidence once again weighs heavily in favor of awarding custody to mother.

■  Finally, we review the extent to which the evidence shows "abuse of one parent by the other." ORS 107.137-(1)(d). In this case there is substantial testimony of father's verbal and physical abuse of mother. Father's response is that

"[m]other conceded that her allegations of [f]ather's alleged anger concerned her, not [the child]. There was no evidence that [f]ather was abusive toward [the child]."

Father further replies that "[i]n all of her descriptions of [f]ather's anger, [m]other did not question [f]ather's love for his child."

Father misses the point. The statute requires that we evaluate "abuse of one parent by the other." ORS 107.137(1)(d). The record is replete with evidence of such abuse.

Father adamantly denies ever engaging in any sort of abusive behavior. Indeed, he denies ever having felt anger towards his wife or any other human being at any time. That testimony cannot be squared with mother's journal of his behavior, with her detailed and credible testimony about his abusive conduct, and with her actions in leaving the security of her home for a women's shelter and obtaining a restraining order against father.

In short, the evidence on the final factor—and, indeed, on all factors—weighs heavily in favor of awarding custody to mother. The trial court erred in awarding father custody of the child.

Because we conclude that mother is to have custody of the child, we need not address mother's assignment concerning whether the trial court erred in failing to reopen the case.

Remanded for entry of modified judgment awarding custody of the child to mother and for further modifications as necessitated by the change in custody. Costs to mother.