Argued and submitted August 27, 1998, remanded in part; otherwise affirmed
April 14, 1999

## In the Matter of the Marriage of

### Massoud TARAGHI,
*Respondent,*

*and*

### Carol A. SPANKE-TARAGHI,
*Appellant.*

### (C94-3539DR; CA A93569)

977 P2d 453

Ridgway K. Foley, Jr., argued the cause for appellant. With him on the brief were Greene & Markley, P. C., and David N. Hobson, Jr., and Hobson, Hobson & Angell, P. C.

Harrison Latto argued the cause for respondent. With him on the brief were Susan H. Williams, and Sorensen-Jolink, Trubo, Williams, McIlhenny & Williams.

Before De Muniz, Presiding Judge, and Deits, Chief Judge, and Haselton, Judge.

DEITS, C. J.

**DEITS, C. J.**

Wife appeals from a dissolution judgment, challenging the trial court's grant of custody of the parties' children to husband with limited parenting time to wife, its distribution of certain assets and liabilities and the amount and duration of its spousal support award. We review *de novo*, ORS 107.405, ORS 19.415(3), and remand for modification of the judgment.

The parties were married in 1982, and they separated in September of 1994. Husband filed for a dissolution in October 1994. The trial was held in January 1996, and judgment was entered in May 1996. At the time of trial, wife was 39, and husband was 35. They have two children who were 10 and 8 at the time of trial. Husband has a college degree and has worked full time at Intel since 1991. Wife has a college degree and holds an Oregon real estate broker's license. She has also worked as a legal secretary. Wife was diagnosed with a bipolar disorder in 1988, and she has been under the care of various health professionals since that time.

The trial court awarded sole custody of the children to husband and gave wife parenting time every other weekend, one week during Christmas break, spring break in alternating years, alternating major holidays, Mother's Day and the children's birthdays in alternate years. Wife's parenting time totaled 68 days per year. Wife was awarded spousal support in the amount of $1,000 per month for 24 months beginning January 1996, then decreasing to $500 per month for an additional 36 months. The trial court ordered the parties to sell their real property and to divide the net proceeds equally between them. The judgment also provided that each party should be responsible for any debts or obligations incurred by that party since the time of the separation. The court used the "time rule" to divide Intel stock options held by husband. The court ordered that when the options are exercised, husband can deduct 45 percent of the proceeds for state and federal taxes, with adjustments for actual taxes due to be made within one week of filing the tax return.

Wife first assigns error to the trial court's award of sole custody to husband with limited parenting time to her.

She argues that she should be awarded custody of the children. She contends that she has been the primary parent of the children and that she is fit to serve as the custodial parent. Wife asserts that the evidence shows that her medical problems are completely under control and that they have not been detrimental to the children in any way. Wife argues alternatively, that even if we determine that husband should retain custody, there is no justification for awarding wife such limited parenting time.

■     In deciding child custody cases, we give primary consideration to the best interests and welfare of the children. ORS 107.137(1). In determining the best interests of the children, this court shall consider:

> "(a)   The emotional ties between the child and other family members;
>
> "(b)   The interest of the parties in and attitude toward the child;
>
> "(c)   The desirability of continuing an existing relationship;
>
> "(d)   The abuse of one parent by the other; and
>
> "(e)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child." ORS 107.137(1).

While the trial court's decision with regard to custody does not bind us, we do regard it as persuasive. *Holcomb and Holcomb*, 132 Or App 498, 502, 888 P2d 1046, *rev den* 321 Or 94 (1995). This is particularly true with respect to credibility determinations. *Sleeper and Sleeper,* 145 Or App 165, 173, 929 P2d 1028 (1996), *rev allowed* 325 Or 367 (1997). Nonetheless, ultimately it is our responsibility to "examine the evidence in the record and reach our own conclusions as to what is in the best interests of the child." *Holcomb,* 132 Or App at

502 (quoting *Sleight and Cazone,* 100 Or App 328, 786 P2d 202 (1990)).

■■ In assessing the first factor under the statute, the emotional ties of the children, it is appropriate to "consider evidence that one parent has been the primary caretaker or is the more nurturing parent." *Boldt and Boldt,* 104 Or App 379, 382, 801 P2d 874 (1990). Wife contends that she has been the primary caretaker of the children throughout the marriage and that husband has devoted little time to parenting because of the demands of his job. Husband argues that wife "has only sporadically been able to serve" as primary caretaker, mostly due to her periodic mental problems, and that he has been devoted to his children and has placed a "higher priority upon them than upon his job * * *." The evidence in the record indicates that the truth is somewhere in between. Wife served as the primary caretaker of the children during a large portion of the marriage. However, husband has also assumed a significant parenting role when necessary because of wife's problems and, over time, appears to have increased his involvement with the children. The evidence demonstrates that, from the time of their separation in 1994 until the dissolution judgment was entered in 1996, the parties shared custody equally.

The second factor that we consider in determining custody is the parties' interest in and attitude toward the children. ORS 107.137(1)(b). The evidence at trial indicates that both parties love their children, are involved in their lives and have their best interest at heart, most of the time. The trial court noted that "[b]oth parents have at times in the past been excellent parents for their children." The parties jointly retained a psychologist, Dr. Catherine Bolstad, to do a custody evaluation. Dr. Bolstad spent a significant amount of time assessing the parties and preparing her recommendation to the court. She met with each parent and each child individually, she observed the children interacting with each of their parents and she evaluated reports and statements from the parties' doctors, family and friends. She commented on both parents' interactions with the children. With regard to wife and the children she said:

"I felt it was somewhat flat and there was a real lack of interaction. They were each doing their own thing rather than cooperatively, say, drawing something or cooperatively playing a game together. There was really very little talk among the three of them during that 40 minutes."

With respect to husband's interaction with the children, Dr. Bolstad commented:

"They appeared to be very comfortable together. It looked to me like they had spent significant amounts of time playing together. They could laugh and joke. They didn't get upset. The kids didn't get upset when their structure fell down. They were willing to let him help them with it, and it didn't feel to me like some of the families I see where there's a real 'Let's shine up the psychologist and show what great family relations we had.'

"I mean, they were joking about things that went on at home, and very much at ease with each other. I didn't have a sense that they really remembered I was in the corner."

Dr. Bolstad did note that husband's visit with the children took place the day after wife's and it is possible that the children were more comfortable with the testing situation on their second visit.

There is no question that, at times, wife's mental problems have interfered with her relationship with her children. Dr. Maletzky, a psychiatrist who began treating wife in 1994, diagnosed a bipolar disorder. He described wife as having a 15-year history of depression. He emphasized that it is important for wife to continue to take medication for her problems. However, he described her as "stable" at the time of trial and, in fact, recommended that wife be given custody of the children. He testified that, in his opinion, wife was the more moderate and conservative of the parents.

With respect to the third statutory factor regarding custody, the "desirability of continuing an existing relationship," we attempt to maintain existing positive relationships between the parents and the children. ORS 107.137(1)(c); *Holcomb,* 132 Or App at 506. Visitation by the noncustodial parent is to be determined "in the best interest of the child, ensuring the noncustodial parent sufficient access to the child to provide for appropriate quality parenting time * * *."

ORS 107.105(1)(b). Here, the parties shared custody equally for over a year with no evidence of detriment to the children. Unquestionably, it is in the children's best interest here to design a custody situation that allows them to maintain their existing relationships with both parents.

The next relevant factor that we consider is the "abuse of one parent by the other." ORS 107.137(1)(d). Since 1988, wife has made frequent allegations of physical, verbal, and sexual abuse by husband. She has obtained numerous restraining orders against him and repeatedly called the police to intervene. The first incident occurred in 1988, in Arizona, and resulted in husband being arrested and eventually pleading no contest to a charge of domestic violence. Before husband's plea, wife wrote a letter to the court explaining that the incident was a result of "marital difficulties" caused by "some complicated medical problems" that she was having at the time. She also wrote a letter to the deputy district attorney stating that husband "did not commit any domestic violence against me the day he was arrested and has never hit me or harmed me in any way previously." At this trial, husband explained that he pled no contest to the Arizona charge on the advice of his attorney. Wife testified in this proceeding that the letters were written at the request of husband and his attorney and that, in truth, husband had assaulted her before his arrest.

Wife contended at trial, and continues to do so on appeal, that husband's abuse continued throughout their marriage. However, as the trial court concluded, there is little evidence in the record to support wife's allegations. In fact, the only evidence in the record of abuse, other than father's no contest plea in Arizona, is an incident reported by the children that occurred shortly before the parties' separation. In that incident, wife initiated an altercation by pushing husband into a closet and he responded by pushing her back out of his way. None of the other witnesses at trial reported observing anything that would indicate ongoing abuse of any kind. In its memorandum opinion, the trial court stated:

"A separate and troubling question is whether or not father is prone to domestic violence. There was some evidence that he committed violence upon his wife while they

were living in Arizona. In fact there is a conviction for this kind of thing there. Father counters with statements from the children. They apparently say that the only physical confrontation was when mother shoved father into a closet and he shoved her back so he could get out of there.

"Father shows a subsequent letter where mother disavows father's domestic violence. Father also indicates that he pled no contest to the Arizona charge and the restraining order was dropped and he moved back in at mother's urging. He also counters with friends and associates and professionals which suggest it is unlikely that he beat upon his wife. The domestic violence alleged by wife here is denied by father. He claims that she uses the allegations as a club to try to get money from him. In fact he says it is she who assaults him. He has no problem however with his Ms. Taraghi having an order restraining him from being around her.

"I handle the vast majority of Family Abuse Prevention Act restraining orders in Washington County. While it is not unusual that an otherwise peaceful man might be a perpetrator of domestic violence, I tend to side with him in this case. In addition to his denial of violence and supporting testimony, it is clear that mother has lied upon occasion. Several witness[es] have mentioned this not with animosity but with seeming concern for factual accuracy."

The final statutory factor that we consider in assessing custody is whether each parent will "facilitate and encourage a close and continuing relationship between the other parent and the child[ren]." ORS 107.137(1)(e). On this issue, we find the testimony of Dr. Bolstad particularly significant. She testified that she found wife to be "very, very angry and hostile" and was concerned that wife's anger and attitude toward husband would interfere with his relationship with the children if wife were awarded custody. Dr. Bolstad testified:

"I believe that Mr. Taraghi is more likely to allow and facilitate Ms. Spanke's relationship with [the children] than she would if she were in the position of the custodial parent.

"I like to see parents sharing custody. I don't think there's a chance of that here in terms of legal custody, because these people do not talk to each other in a reasonable way at all. So I think that we're talking legal custody

and then physical, what they're going to do day to day with the kids.

"I think that parenting on a part-time basis is well within—hopefully well within her capacity to do. And given that the children have done adequately with the week on, week off, I'm recommending that the legal custody be with Mr. Taraghi, and that they share the children on approximately a 50-50 time-share basis with the kids going back and forth."

After considering all of the applicable statutory factors, we agree with the trial court's determination that father should be awarded custody of the children. We are particularly persuaded by the evidence in the record that father was the parent most likely to facilitate the children's continuing relationship with the other parent. We do not, however, agree with the limited parenting time given to wife. As noted above, the trial court limited wife's parenting time to 68 days or approximately 18 percent. Wife argues that there is simply no justification for allowing her such a limited amount of parenting time. We agree. The trial court's decision to impose this limit on wife's parenting time seemed to be predicated on concerns about her mental condition. The court stated that while wife's "medication may largely mitigate her condition" it was the court's view that during her testimony at trial her condition "seem[ed] not to be anywhere near total control."

Our review of the record, however, does not convince us that wife is incapable of assuming the responsibility of more equal parenting time with the children. At the time of her initial diagnosis in 1988, and periodically since that time, wife has had some difficulty caring for the children. In 1993, when she believed that her condition was worsening, wife admitted herself to a day treatment program at the Woodland Park Hospital psychiatric facility in order to receive more intensive treatment. However, the evidence indicates that more recently, and at the time of trial, she was managing her illness through medication and therapy in such a way to allow her to care adequately for the children. Significantly, both Dr. Bolstad and Dr. Maletzky testified that wife is capable of parenting if she continued to take her medication as prescribed.

As discussed above, the parties had, in fact, shared physical custody for approximately 15 months prior to trial. There is no evidence in the record that this custody arrangement was not successful and there is no indication that the children suffered any detriment from this arrangement. At trial, none of the neighbors or friends of the parties testified that mother was presently unfit as a parent. Husband himself testified that the custody arrangement was "not harming [the children]," and the parties' oldest child told Dr. Bolstad that, as far as she was concerned, the schedule worked. Dr. Bolstad, in fact, recommended in her custody evaluation that the parties share equal parenting time.

Father has expressed concern that wife will not continue to take the medication that allowed her to achieve the level of stability that she apparently had at the time of trial. That is a legitimate and serious concern. We believe, however, that the condition imposed by the trial court is sufficient to address that concern. That condition provides:

> "Should [father] believe that the children are in danger because of [wife's] mental condition, he may immediately file for a suspension of visitation. If the court finds that the condition, if any, does not merit a change or suspension, the court may award attorney fees and costs against [father]. This award may be mitigated or eliminated if the court finds that at the time the condition arose, [wife's] condition was such as to cause a reasonable parent to withhold, limit, or condition visitation."

After considering all of the evidence in the record, it is our view that limiting wife's parenting time to 68 days per year does not provide wife with sufficient access to the children to allow her to have quality parenting time. We are not convinced that the evidence in this record justifies the limitation. We conclude that, under all of the circumstances here, it is in the best interests of the children to allow wife parenting time of approximately 40 percent of the children's time. Accordingly, we remand to the trial court for determination of specific parenting time not inconsistent with this opinion.[1]

---

[1] On remand, child support also must be recalculated in light of the new parenting schedule and the modifications of spousal support made in this opinion.

■ Wife's second assignment of error is that the trial court's award of spousal support was inadequate. The trial court awarded wife $1,000 per month for two years and $500 per month for an additional three years. In establishing the proper amount of spousal support, we attempt to award support that is "just and equitable" under all of the circumstances. The award should take into account the parties' needs and ability to pay, while furthering the goal of ending the dependancy relationship within a reasonable time if it can be done "without injustice or undue hardship." *Pagano and Pagano,* 147 Or App 357, 360, 935 P2d 1246 (1997) (citing *Grove and Grove,* 280 Or 341, 353, 571 P2d 477, *mod* 280 Or 769, 572 P2d 1320 (1977)). ORS 107.105(1)(d) enumerates the factors to be considered in making a spousal support determination. They include: the length of the marriage, the ages of the parties, the mental and physical health of the parties, their respective earning capacities, the need for education or training to enable a party to be self-supporting, the standard of living the parties shared during the marriage, and whether a party's future earning capacity was impaired by an absence from the workforce in order to remain at home.

■ The parties here were married for 13 years. They are relatively young and both have college degrees, but, as discussed above, wife suffers from a mental disorder that has impaired her ability to take full advantage of the career opportunities available to her. Although wife graduated from college with honors and was subsequently accepted at a number of law schools, she did not pursue a law degree. She has not worked full time for many years. While husband and wife dispute the exact reasons for wife foregoing law school and for not working full time during their marriage, evidence presented at trial indicates that it was a joint decision of the parties that she would remain at home to care for their children. Wife has an Oregon real estate broker's license and, at the time of trial, she was working part time as a legal secretary. As of December 15, 1995, wife had grossed $11,425.50 for the year. In addition, at the time of trial, wife had one house listed for sale as a real estate broker. Wife testified that she hoped to be working full time within two years, but that she had discouraged offers of full-time employment until after her dissolution was final. The trial court found that wife was

capable of earning $2,500 per month. Husband's income has varied according to the number of bonuses and awards that he has received. As of December 15, 1995, he had grossed $91,371.09 for that year. In 1994, husband's base pay plus bonuses totaled more than $86,000. There is no indication in the record that his income will decrease.

■ While the purpose of spousal support is not to eliminate disparities in the parties' incomes, it is appropriate, when the pursuit of one spouse's career goals has been foregone due to homemaking duties, *Fisher and Fisher,* 148 Or App 208, 215, 939 P2d 149 (1997) (citing *McDonough and McDonough,* 141 Or App 116, 917 P2d 36 (1996)), or illness, to award support that will lessen the disparity. *See Richardson and Richardson,* 307 Or 370, 384, 769 P2d 179 (1989) ("Although spousal support payments are designed largely to help a spouse overcome the effects of domesticity, spousal support is nevertheless appropriate even where a spouse's impaired earning capacity results not from homemaking activities but from health problems.").

Here, wife has significant education, but she has foregone career opportunities to attend to her children as well as to deal with her mental health problems. Even accepting the trial court's optimistic opinion that wife is capable of earning $2,500 per month in a full-time position, in view of all of the circumstances here, we believe that additional support is necessary to allow wife time to become self-supporting at a standard of living not disproportionate to that enjoyed by the parties during the marriage. We conclude that appropriate spousal support is $1,000 per month for three years, beginning in January 1996, and $750 per month for five years, beginning in January 1999.

■ Wife's third assignment of error is that the trial court erred in dividing some of the parties' assets and liabilities as of the date of separation rather than as of the date of dissolution. With respect to the parties' liabilities, wife argues that this results in her assumption of "virtually all debts after the parties' separation, even those incurred during the marriage and/or necessary for rearing the children and maintaining the family home which was to be sold and divided between Husband and Wife." However, wife does not

offer any specific arguments or information regarding the division of the parties' liabilities, nor does she provide any alternative proposals for the division of the liabilities. Without specific arguments and information on this issue, we decline to address it.

With respect to the division of the parties' assets, wife argues that the trial court erred in using the "time rule" to divide the Intel stock options held in husband's name. She also contends that the court erred in using the date of the parties' separation rather than the date of dissolution as the appropriate date on which to base wife's entitlement to the options. Wife contends that she is entitled to one half of all the stock options, both vested and unvested, that husband had received up to the date of the dissolution.

In *Powell and Powell,* 147 Or App 17, 934 P2d 612, *rev den* 326 Or 62 (1997), we discussed the use of the "time rule" with respect to unvested stock options. In that case, we held that courts must assess the unique facts of each case and determine what is "just and proper" under the particular facts. As we explained: "[c]areful attention to the documents and other evidence surrounding a particular option award [is] needed" in order to determine whether a given stock option should be prorated "to reflect the amount of time that each option was held during marriage." *Id.* at 22-23.

■    The Intel "Stock Option User Manual" states:

"The Stock Option Program is an important part of Intel's compensation and benefits program. By obtaining the right to acquire an equity interest in Intel, you acquire a stake in the long-term growth of Intel and can potentially benefit from the capital appreciation of Intel stock."

The options here were awarded during annual employee reviews. Husband's supervisor, Joe Murphy, testified that Intel stock options are awarded to employees who consistently put in a good performance and that, because the stock options do not vest for five years and terminate if the employee leaves the company, they act as a "big disincentive over time to leave the company." He explained that "people who are consistently putting in very good performance will always have a certain number of options out there in front of

them" and that the options are lost if the employee leaves the company before they vest. Based on the record in this case, it appears that Intel had mixed purposes for granting the options to husband. Based on these circumstances, as future incentive, on *de novo* review, we conclude that the trial court was correct in applying the "time rule" in distributing husband's stock options.

The remaining issue is whether in dividing the stock options under the "time rule" the court was correct in using the date of the parties' separation, rather than the date of dissolution, as the dividing point when calculating the fraction representing wife's entitlement. The stock options acquired during the time period between the parties' separation and the dissolution are a marital asset and as such are subject to the presumption of equal contribution. ORS 107.105(1)(f); *Massee and Massee*, 328 Or 195, 207, 970 P2d 1203 (1999). That presumption, of course, may be overcome by a showing that the other spouse did not contribute, either directly or indirectly, to the acquisition of the marital asset in question. "The spouse disputing the presumption of equal contribution has the burden of proving by a preponderance of the evidence that it is more probable than not that the other spouse did *not* contribute equally to the acquisition of the property." *Stice and Stice*, 308 Or 316, 326, 779 P2d 1020 (1989) (emphasis in original).

We conclude that husband met the burden of rebutting the presumption of equal contribution to the acquisition of stock options after the parties' separation. The evidence demonstrates that, during the period of the separation, wife did not directly contribute to their acquisition and that, if anything she actually interfered with husband's ability to work. As the trial court said, "there was not only no contribution by the wife to the building up of the benefits, but there was quite a bit of detriment." The evidence also shows that wife's contribution as a homemaker did not constitute a significant indirect contribution to the acquisition of that marital asset. *See Massee*, 328 Or at 205. Although the evidence demonstrates that wife did fulfill some "homemaking" responsibilities during this time period, husband did as well. At this time, both parties were caring for the children. These circumstances, considered together with the fact that part of

the purpose of the company's award of the stock options to husband was to serve as a future incentive to him, leads us to conclude that husband did rebut the presumption of equal contribution. We hold that the trial court's division of the stock options was just and proper under all of the circumstances.

■ Finally, wife argues that this court should modify the provision in the trial court judgment that allows husband to deduct his taxes before distributing to wife her share of the proceeds of the sale of the options. The trial court did not err. A sale of the stock upon exercise of the options is contemplated and husband will be taxed on the entire capital gain. *See Follansbee and Ackerman,* 115 Or App 39, 41-42, 836 P2d 763 (1992).

Remanded for modification of parenting time to 40 percent; modification of spousal support award to provide $1,000 per month for three years, beginning in January 1996, and $750 per month for five years, beginning in January 1999; recalculation of child support in light of the above modifications; otherwise affirmed.