Argued and submitted November 5, 2007, dissolution judgment modified to award custody of children to mother; award of child support to father reversed; remanded for reconsideration of child support, the development of a parenting time schedule, and consideration of spousal support July 2, 2008

# In the Matter of the Marriage of

## Randy Frank RINGLER,
*Petitioner-Respondent,*

*and*

## Connie Sue RINGLER,
*Respondent-Appellant.*

## Lane County Circuit Court
150606421; A133621

188 P3d 461

Jeffrey E. Potter argued the cause for appellant. With him on the briefs was Gardner, Honsowetz, Potter, Budge & Ford.

George W. Kelly argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

LANDAU, P. J.

## LANDAU, P. J.

Upon the dissolution of the parties' five-year marriage, the trial court awarded custody of their two children to father and ordered mother to pay child support. Mother appeals, assigning error to the custody award, to the child support award, and to the trial court's failure to award her transitional spousal support. Meanwhile, pending the outcome of the appeal, this court granted a stay of the custody award; that is to say, the children have remained in mother's custody.

We agree with mother that the trial court erred in awarding custody of the children to father. We therefore reverse the award of custody and the award of child support and remand for reconsideration of the child support and spousal support awards.

The parties began living together in 1999 and were married in 2001. They separated in February 2006, when mother moved out with the children into subsidized housing. The parties have two children, a daughter and a son, who were ages nearly five and two and one-half, respectively, at the time of trial in July 2006. The five-year-old daughter was born with a heart defect that was surgically repaired at age nine months. Mother also has custody of two children from previous relationships, who were ages 17 and 12 at the time of trial. Custody of the two older children is not at issue in this case.

Mother was 38 at the time of trial. She graduated from high school and attended one semester of college. Before the marriage, she worked as a cashier in a market, as a veterinarian's assistant, and as a caregiver in an adult foster care home. She did not work during the marriage and has, instead, been the primary parent for the children. Father worked full time, and mother was the parent who was most involved with the children's medical care, child care, and education.

Father was 44 at the time of trial. He is employed as a carpenter. At the time of trial, he had worked for his current employer for a little over four years.

The parties had a difficult relationship. There is evidence that, at least in the early years of their marriage, both mother and father had alcohol problems and that both had problems dealing with anger. The extent to which each was violent toward the other is very much in dispute. Father contends that mother was unpredictably violent and that she assaulted him on several occasions, attacking him with a hammer and kitchen knives, pulling out his hair, and kicking and punching him. Mother contends that father was the violent party, that he threatened her with violence if she were to leave with the children, and that, on more than one occasion, she obtained Family Abuse Prevention Act (FAPA) restraining orders against him. Most recently, mother obtained a FAPA order in January 2006, shortly before she moved out of the house. The record of the proceeding that led to that restraining order is not in the record of this case. It is undisputed, however, that the FAPA order was entered against father and that he was represented at the FAPA hearing.

At trial, mother requested custody of the children, child support, and transitional spousal support. The testimony focused primarily on the issue of custody. Mother offered the testimony of several witnesses who had observed her parenting skills. Both Hudson, the Head Start advocate for the family, and Scott, the daughter's Head Start teacher, described mother as an involved and good parent. Hudson described mother as "[v]ery special, very present for her children and their needs," as volunteering regularly in the daughter's classroom and, in the beginning, helping the daughter become accustomed to the classroom. Hudson noticed that, after the parties separated in February 2006, the daughter seemed happier and more outgoing and relaxed.

Scott, who had been teaching for 30 years, described the daughter as bright and progressing well. When she first started preschool, the daughter, who has a speech disorder, was shy and uncomfortable. The teacher saw mother at least weekly when she assisted in the classroom and testified that mother was an excellent volunteer and is a "very caring" mother. She also observed mother with the son, who would come with mother when she volunteered in the classroom. Scott testified that mother would make sure to bring a little

snack for him and would comfort him appropriately if he became tired or upset. The teacher testified that the children are closely bonded to their older half-siblings. She wrote a letter of recommendation in support of mother's employment working with children at Head Start.

Mother's friend, Chambers, testified that mother is a good parent, "attentive [and] caring," who is close with her children, communicates well with them, and disciplines them appropriately. Chambers also testified that the children are close to their two older half-siblings. The evidence shows that the two younger children are healthy and that mother's two older children are well-adjusted and successful in school.

Mother testified that, during the marriage, she was primarily responsible for the care of the children and that father played with them when he was not working. She testified that, during the early part of her relationship with father, she and father drank alcohol and smoked marijuana. She testified that, about a year after they met, husband became violent toward her. She testified that she has quit drinking and smoking, but that father continues to drink. She testified that, in front of the children, father has threatened her, used foul language, kicked her, slapped her, and pushed her down.

Mother testified that she obtained a FAPA restraining order in January 2002, before the daughter's heart surgery, and again in January 2006, when mother moved out of the house with the children. As a result of that second order, which was still in effect at the time of trial, father had only supervised visits with the children, under the direction of Christians Addressing Family Abuse (CAFA). Mother testified that she and the children moved out of the family home in January 2006 without telling father, because she feared that he might harm her or the children. She is concerned about father's inability to control his temper and fears that, when faced with the challenges of unsupervised visits with the children, he might harm them.

Father paints a different picture. Father testified that he loves the children, that they mean everything to him, and that he has never lost control of his temper or experienced frustration with them. He testified that he has been

involved with the children as much as possible, spending time with them and playing with them to the best of his ability in light of his full-time employment. He testified that he has never been violent toward mother, but that she has been physically abusive to him, and that if he has caused her injury, it has only been in self-defense. He testified that mother occasionally becomes violent toward him without provocation, and that she has assaulted him on several occasions. Father testified that, in September 2001, mother took a two-by-six board and smashed the windshield of his truck. He testified that, in December 2001, mother assaulted him by smashing her knee into his face and pulling out his hair.

Father testified that he tolerated mother's violent behavior for the sake of his marriage and in an effort to help mother recover from anger caused by a traumatic event in her youth. Father testified that mother continues to drink heavily on occasion and that she lacks good judgment when intoxicated. He testified that, in December 2001, he witnessed mother breast-feed their daughter while intoxicated and that he has also seen her drive with the children while under the influence of alcohol. He testified that mother disciplines the children harshly, and that she screams at them, swats them, and slings them around. He testified that mother is unstable, is irresponsible with money, and obtained the second FAPA order in order to give herself an advantage in an anticipated custody dispute.

Sergeant Carpenter of the Springfield Police Department testified that, in December 2001, he was dispatched to a domestic dispute involving the parties and found father with his lips swollen and bloody. Mother did not appear to have any injuries, but was intoxicated and was breast-feeding the parties' daughter, who was then an infant. Mother admitted at trial that she did drink in 2001, but testified that she no longer drinks.

In support of his request for custody of the children, father called Stancil, a supervised visitation coach for CAFA. Stancil testified that, according to CAFA's assessment, father is a person at medium risk of being violent, meaning that he is "easily provoked, resentful and can be hostile. Under stress

or when upset, this person can be overly reactive." She testi-fied that, as required by the FAPA restraining order, she had supervised father's visits with the children since April 2006. She testified that the visits had gone well and that father was appropriate with the children, had never missed a visit, and had taken advantage of parenting classes and anger manage-ment classes offered by CAFA. Stancil testified further:

"Q. And you've done two months worth of visits. Is that correct? From the end of April?

"A. Yes, * * * from the end of April until, we actually had a visit on July 4th.

"Q. And do you feel that that is * * * enough visits to make a determination about [father's] parenting time unsupervised? Or his parenting skills when they're unsupervised?

"A. I don't know enough about the whole situation to make that determination myself. I can just say that I think that he has benefitted from the supervised time, from the classes, you know, that he's been taking.

"Q. Do you think he would benefit from continual supervision?

"A. At this time I do.

"Q. And I want to ask you about [mother].

"A. Uh huh.

"Q. * * * Is she supportive of the visits?

"A. Yes.

"Q. * * * [W]hat are the things that she does to support the children's relationship with their father?

"A. She has not missed a visit. And she's very willing to arrange her schedule to accommodate, you know, there's sort of a limited window when we can have the visits due to the CAFA playroom availability and she's been very willing to arrange her time. The children almost always bring him cookies and other treats, art work, things that they have made for him at home.

"Q. Have you ever seen her encourage [daughter] to go into the visit when she's expressing anxiety * * *?

"A. Yes, uh huh."

Father believes that he is an excellent parent, better than mother at managing finances, and that he could provide the children with a stable home life. Father testified that he experiences anxiety over the prospect of mother having custody of the children and entering into a relationship with a man who might not be as tolerant as he has been of mother's anger and violence, and who might harm mother or the children. Father's employer testified that father is employed full time and that he is a dependable employee.

The trial court awarded custody of the children to father and awarded mother parenting time every other weekend and holiday, and two weeks over the summer. The court noted the extreme animosity of the parties toward one another. In explaining its ruling, the court stated that "there is no supreme clarity as to which parent is the better parent by statutory standards," and found that "both parents have profound deficits as parents." The court declined to make detailed findings, so as not to give the parties "gratuitous ammunition" to use in their "nefarious battle." But the court ultimately concluded that the scale of evidence tipped in favor of father. The court expressed concerns about father's past behavior, but expressed hope "that those behaviors will prove to continue to be in the past and will not be repeated." The trial court discounted the importance of the fact that mother had obtained FAPA restraining orders against father, in that they "tell us little or nothing about anyone or anything and have come to have little credibility *per se*, especially if they are uncontested." The court ordered mother to pay $144 per month child support. It also declined to award mother any transitional spousal support.

■ ■ On appeal, mother first assigns error to the trial court's award of child custody to father. The relevant criteria for evaluating child custody decisions are set out by statute in ORS 107.137, which provides:

"(1) In determining custody of a minor child under ORS 107.105 or 107.135, the court shall give primary consideration to the best interests and welfare of the child. In determining the best interests and welfare of the child, the court shall consider the following relevant factors:

"(a) The emotional ties between the child and other family members;

"(b) The interest of the parties in and attitude toward the child;

"(c) The desirability of continuing an existing relationship;

"(d) The abuse of one parent by the other;

"(e) The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f) The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. However, the court may not consider such willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in a pattern of behavior of abuse against the parent or a child and that a continuing relationship with the other parent will endanger the health or safety of either parent or the child.

"(2) The best interests and welfare of the child in a custody matter shall not be determined by isolating any one of the relevant factors referred to in subsection (1) of this section, or any other relevant factor, and relying on it to the exclusion of other factors. However, if a parent has committed abuse, as defined in ORS 107.705,[1] there is a rebuttable presumption that it is not in the best interests and welfare of the child to award sole or joint custody of the child to the parent who committed the abuse.

"(3) In determining custody of a minor child under ORS 107.105 or 107.135, the court shall consider the conduct, marital status, income, social environment or life

---

[1] ORS 107.705 provides, in part:

"(1) 'Abuse' means the occurrence of one or more of the following acts between family or household members:

"(a) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

"(b) Intentionally, knowingly or recklessly placing another in fear of imminent bodily injury.

"(c) Causing another to engage in involuntary sexual relations by force or threat of force."

style of either party only if it is shown that any of these factors are causing or may cause emotional or physical damage to the child."

A trial court's evaluation of those criteria in reaching a custody decision is entitled to careful consideration, particularly when credibility determinations are involved. *Sleeper and Sleeper*, 145 Or App 165, 173, 929 P2d 1028 (1996), *aff'd*, 328 Or 504, 982 P2d 1126 (1999). Still, we exercise *de novo* review, ORS 19.415(3), and it is ultimately our own responsibility to "examine the evidence in the record and reach our own conclusions as to what is in the best interests of the child." *Holcomb and Holcomb*, 132 Or App 498, 502, 888 P2d 1046, *rev den*, 321 Or 94 (1995) (quoting *Sleight and Cazone*, 100 Or App 325, 328, 786 P2d 202 (1990)).

■　　　We begin by noting the importance of the existence of an outstanding FAPA order against father at the time of trial. ORS 107.137(2). Under ORS 107.710, in order to obtain a FAPA restraining order, a petitioner must prove, by a preponderance of evidence, that he or she has been the victim of "abuse," as that term is defined in ORS 107.705. Under ORS 107.137(2), in turn, "if a parent has committed abuse, as defined in ORS 107.705," a rebuttable presumption arises against awarding custody to the abusing parent. Thus, when mother established the predicate for obtaining the FAPA order against father, she established the predicate for a presumption that it is not in the best interests of the children to award custody to father.

　　　The trial court, as we noted, discounted the importance of the FAPA order, because it concluded that those orders "have come to have little credibility *per se*, especially if they are uncontested." In this case, however, the record shows that mother's petition for a FAPA order was not uncontested and that, in fact, father was represented by counsel at the FAPA hearing.

■　　　Father likewise discounts the importance of the FAPA order on the ground that we do not know the specific allegations of abuse that formed the basis for the issuance of the order and because "the statutes make a FAPA order so

easy to obtain that just about anyone at any time telling the court nearly any story can obtain one." Father, however, neglects to address the fact that, whatever the particulars of the allegations of abuse happened to be, the fact remains that, before issuing the FAPA order, the court necessarily found that "abuse" within the meaning of ORS 107.705 occurred, and it is precisely the same "abuse" that triggers the presumption against an award of custody. We turn, then, to an examination of the record to determine whether the evidence is sufficient to rebut the presumption that it is not in the best interests of the children to award custody to father. We find insufficient evidence to rebut that presumption.

Both parents demonstrate a strong interest in the children. ORS 107.137(1)(b). Mother, however, has been the primary caregiver, and that favors her in the custody determination, ORS 107.137(1)(e), especially in light of the young age of the children. *See Boldt and Boldt*, 104 Or App 379, 382, 801 P2d 874 (1990) ("[A]ll other things being equal, small children should go with the caretaking and more nurturing parent.").

Additionally, the evidence does not persuade us that mother is presently unfit. ORS 107.137(1)(e). Father presented evidence of events from more than four years before the dissolution trial reflecting poorly on mother, but he offered no evidence reflecting poorly on mother's current parenting. In contrast, mother presented the testimony of several witnesses who have known her during the year before trial and who described her as an exemplary parent. As to his own parenting skills, other than his own testimony, the only evidence that father presented was that of the CAFA visitation supervisor, who expressly disclaimed the ability to recommend that father have unsupervised *visits* with the children, let alone custody, and who stated that father would benefit from continued supervised visits.

The children are closely bonded to their half-siblings and have a relationship with mother's family, whom they see regularly. Awarding custody to mother would facilitate those relationships. ORS 107.137(1)(a). The evidence also shows that mother will also facilitate the children's visits with father. ORS 107.137(1)(f).

Considering each of the factors set out in ORS 107.137(1), we conclude that the best interests of the children require that mother be awarded custody. Necessarily, we also reverse the trial court's award of child support to father and remand for reconsideration of child support.

Mother also assigns error to the trial court's failure to award her transitional spousal support. Transitional spousal support may be awarded "[a]s needed for a party to attain education and training necessary to allow the party to prepare for reentry into the job market or for advancement therein." ORS 107.105(1)(d)(A). Among the factors that are to be considered in evaluating a request for transitional support are the duration of the marriage, a party's training and employment skills, the party's work experience, the financial needs and resources of each party, and the party's "custodial and child support responsibilities." *Id.*

Mother contends that she is entitled to transitional support to enable her to pursue a degree in early education so that her work schedule will be similar to the children's school schedule. She requests $300 per month in transitional support for three years to allow her return to school at Lane Community College.

Father opposes the request. He contends that mother does not need spousal support, because she lives in subsidized housing and has other financial resources, including supplemental security income for the daughter, child support for the two older children, and food stamps. Father asserts, further, that mother prefers not to work and that her expressed interest in pursuing further education is not genuine.

We have ordered a change in custody and remand the case to the trial court for reconsideration of child support. Given that those changed considerations are among those that are to be taken into account under the statute in determining whether to award transitional support, we also remand the case for the court to reconsider its determination not to award spousal support.

Dissolution judgment modified to award custody of children to mother; award of child support to father reversed;

remanded for reconsideration of child support, the development of a parenting time schedule, and consideration of spousal support.