Argued and submitted May 20, 1998; resubmitted En Banc May 12, remanded in part; otherwise affirmed October 27, 1999

## James E. WAY,
*Respondent,*

*v.*

## Stephanie PROSCH,
*Appellant.*

## (CV 96-0886; CA A98216)

988 P2d 422

Kimberly A. Quach argued the cause for appellant. With her on the brief was Gevurtz, Menashe, Larson, Yates & Howe, P. C.

Dale L. Smith argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim, and Kistler, Judges, and Warren, Senior Judge.

EDMONDS, J.

Armstrong, J., dissenting.

**EDMONDS, J.**

Mother appeals from a judgment awarding father custody of their son and requiring her to pay child support. She makes three assignments of error: (1) that the trial court erred in denying her motion for a new trial under ORCP 64 (B)(1); (2) that the trial court erred in awarding custody to father; and (3) that the trial court erred in calculating child support. We remand for the recalculation of child support but otherwise affirm.

The parties' son was born in 1990 while they were cohabiting. They continued to cohabit for approximately 11 months thereafter, before separating. When they separated, the parties agreed that mother would be the primary care-giver and that father would have visitation rights. In 1992, they briefly reconciled but then separated again. In 1994, father married his present wife. The parties dispute which parent had the primary care and custody of the child beginning in the fall of 1994. In August 1996, father filed the petition for custody that led to the judgment in this case. In response to the petition, mother sought custody and child support.

The matter went to trial on February 28, 1997, before the Honorable Garry J. Reynolds, Circuit Court Judge for Umatilla County. Judge Reynolds issued a four-page memorandum opinion on March 4, 1997, in which he found that the parties' child had been primarily in the care of father since 1994. He based his finding in part on the written records of the daycare provider used by both parties, noting that the records supported father's testimony and contradicted mother's testimony. He also found that the environment in father's home provided a stable and supportive situation for the child and that it was in the child's best interests that father's *de facto* custody continue.

On April 14, 1997, mother moved for a new trial pursuant to ORCP 64. In support of her argument that there had been an irregularity in the February trial, mother and her attorney filed supporting affidavits claiming that Judge Reynolds had had pretrial contact with father regarding the custody issue as an attorney and before he became a circuit

judge.[1] On receipt of the motion, Judge Reynolds wrote a

[1] Mother's affidavit says, in pertinent part:

"2

"Specifically, I have been informed that Trial Judge Garry Reynolds did, in fact, consult with James Way, the petitioner herein about this custody case while in private practice of law. After being served with the papers in August 1996, I took the papers to Kurt Bendixsen's office. Mr. Bendixsen prepared some pleadings for me to respond to these allegations, but then told me he could not represent me further because he had a conflict in his office with this case. I took the papers to Mr. Ditton, who filed them for me and has represented me in these proceedings since that time.

"3

"On February 28, 1997, before the start of this trial, I told Mr. Ditton that I thought Judge Reynolds may have talked with Mr. Way about this case. Mr. Ditton told me that if Judge Reynolds remembered talking to Mr. Way about this, that he would mention it and disqualify himself, and Mr. Ditton further informed me that, in his opinion, Judge Reynolds would be ultimately fair. Mr. Ditton advised me that if I did not want to proceed that morning, that I could probably get a different trial date with a different judge. However, based upon Mr. Ditton's statements to me that Judge Reynolds would be ultimately fair and that if Judge Reynolds recognized a conflict, he would disqualify himself, I proceeded to the trial.

"4

"Since that time, I have learned that Mr. Way did, in fact, see Judge Reynolds about this case. I believe, therefore, that he should have disqualified himself, and that this is an irregularity in these proceedings which is sufficient to grant a new trial.

"5

"The petitioner, James Way, never disclosed that he had, in fact, talked with Mr. Reynolds and his failure to do so should also render this motion for a new trial well taken. If, in fact, he had spoken with Mr. Reynolds, he should have disclosed that to the respondent and the respondent's attorney."

Mother's attorney's affidavit says, in pertinent part:

"2

"I believe that a new trial should be granted in this case because of irregularities in the proceedings. It has come to my attention that the trial judge may have advised the petitioner about his rights and obligations in this very case while practicing law in Hermiston, Oregon. I knew that the respondent had spoken with Kurt Bendixsen and had been informed of a conflict in his office Mr. Bendixsen then referred the case to me.

"3

"Prior to the hearing of this case on February 28, 1997, my client mentioned to me in the hallway of the Courthouse that she thought Mr. Way may have talked to Garry Reynolds about this case. I told her that I did not have firsthand knowledge of that, but if she wished me to we could request a new trial judge. I also told her I thought that Judge Reynolds would disqualify himself if he recognized this as a case which he had prior knowledge of and also that I felt Judge Reynolds would be ultimately fair in hearing this matter. I

letter to the parties dated May 9, 1997,[2] and recused himself. However, the court file reflects that the "order and decree of custody, visitation and child support" awarding custody of the parties' child to father was signed by Judge Reynolds and entered in the court register on May 29, 1997. On June 3, Judge Jack F. Olsen signed a money judgment for the child support obligation. The file next reflects an order dated June 13, 1997, reciting that Judge Olsen heard argument on May 27, 1997, and reviewed the file before denying mother's motion for a new trial. Mother then filed her notice of appeal from

> "the Judgment and Decree of Dissolution of Marriage entered in this case on May 29, 1997 by The Honorable Garry Reynolds * * *, the Order Denying New trial entered by The Honorable Jack F. Olsen, on June 13, 1997 * * * and the Money Judgment entered by the Honorable Garry Reynolds * * * on June 3, 1997."

We first discern what is properly before us on appeal. We can find no judgment of dissolution of marriage signed by Judge Reynolds and dated May 29, 1997, in the court file. In fact, the record reflects that the parties were

---

told her that if she was uncomfortable with Judge Reynolds, we could seek to get a new judge if she wanted to.

"4

"My client has since informed me that she believes Judge Reynolds may have even advised Mr. Way about the strategy options for obtaining custody. To me, that seems to be clearly an irregularity. I believe that this would have prevented my client from receiving a fair trial.

"Lastly, if, in fact, Mr. Way ever did speak with Judge Reynolds about this case when Judge Reynolds was a private attorney, I believe there would have been an obligation on the part of Mr. Way to inform the respondent of that fact. I was never told by Mr. Way or by his attorney, that he had seen Judge Reynolds about this case. I knew that Kurt Bendixsen said he had a conflict, but the face to face meeting between the petitioner and Judge Reynolds was never made known to me until this time."

[2] The letter says:

"I am in receipt of Mr. Ditton's documents regarding a new trial in the above entitled matter. Upon review of the documents I contacted my old law office and after they searched the records they advised that I had a miscellaneous office conference with Mr. Way on April 16, 1996 regarding his son. While I have no memory of the contact it is regrettable that this was not brought to my attention before the hearing. I am immediately recusing myself from this matter and am referring both Mr. Ditton's motion for a new trial and Mr. Smith's proposed Order to the presiding judge."

never married. However, it appears, and the parties do not otherwise contend, that the notice of appeal is in reference to the "order and decree of custody, visitation and child support" entered on May 29. Additionally, there is no money judgment in the file executed by Judge Reynolds. The money judgment in the file was executed by Judge Olsen on June 3, 1997. Nonetheless, we deem that judgment to be properly before us on appeal as well as the order denying mother's motion for a new trial dated June 13, 1997.

■   We turn next to the fact that the motion for a new trial was filed before the judgments were entered. The motion for a new trial was filed on April 14. The judgment providing for custody to father was entered on May 29. The judgment for child support was entered on June 3. ORCP 64 F provides, in pertinent part: "A motion to set aside a judgment and for a new trial, with the affidavits, if any, in support thereof, shall be filed *not later than* 10 days *after the entry of the judgment* sought to be set aside or such further time as the court may allow." (Emphasis added.) We inquire whether the filing of the motion for a new trial before the entry of the final judgments renders the motion a nullity in light of the language of the rule.

■   In *Highway Commission v. Fisch-Or*, 241 Or 412, 399 P2d 1011, *on reh'g* 406 P2d 539 (1965), the Supreme Court held that, under *former* ORS 17.615 (1963), a motion for a new trial filed before the time that the judgment was entered was viable and timely. *Former* ORS 17.615 (1963) required that a motion be filed "within" 10 days of the entry of the judgment. The court reasoned that the legislature intended that phrase to mean "not later than" and that, when no objection is taken by the opposing party to the early filing of a motion for a new trial, "the irregularity presumably is harmless and should be deemed waived." *Id.* at 417-18. When the legislature replaced *former* ORS 17.615 (1963) with ORCP 64 F, the legislature used the "not later than" language in the rule rather than adopting the "within" language. Here, father did not object to the trial court to mother's premature filing of the new trial motion. Under the circumstances, we conclude that the premature filing of the motion for a new trial does not render it a nullity.

■       Next, we turn to a discussion of our standard of review and how it affects our analysis of the assignments of error. We review the denial of a motion for new trial for an abuse of discretion. *Holemar and Holemar*, 35 Or App 111, 114-15, 580 P2d 1058, *rev den* 284 Or 1 (1978). In contrast, our standard of review regarding the appeal from the award of custody is *de novo*. ORS 19.415(3). As to the appeal from the calculation of child support, mother asserts that, pursuant to the court's order regarding custody, she has custody of their son 50 percent of the time, rather than 40 percent as found by the trial court. The trial court set child support payments based on the 40 percent calculation. If we do not change the custody determination, then father concedes error as to the trial court's calculation regarding child support.

■       In light of the applicable standards of review, we turn first to the assignment of error pertaining to the award of custody to father. Mother essentially argues that the evidence does not support the trial court's determination that granting custody to father is in the best interests of the child. On appeal, we examine the evidence in the record and reach our own determination as to what is in the best interests of the child. *Holcomb and Holcomb*, 132 Or App 498, 502, 888 P2d 1046, *rev den* 321 Or 94 (1995). However, unless, in our view, we are able to make a clearly preferable decision, the decision of the trial court should not be disturbed. *Southwell and Spettel*, 119 Or App 366, 371, 851 P2d 599 (1993). Here, after reviewing the record in light of mother's arguments, we are not persuaded that the trial court's conclusion was erroneous. Father has been the primary parent since the fall of 1994, and in considering all other relevant factors, it is in the best interests of the child that his custody continue with father. It follows that the award of custody should be affirmed and the case remanded to the trial court for the recalculation of child support unless mother's assignment of error regarding the motion for a new trial has merit.

■       In that regard, mother does not contest the accuracy of Judge Reynolds's May 9 letter. Rather, she asserts,

"The trial judge indicated that the case was very difficult, and that he had never 'seen a case' where the parties

offered 'such diametrically opposing testimony' on the issue of who primarily parented the child. * * * As will be discussed in more detail *infra*, the court relied on the testimony of a day care provider who had a preexisting relationship with the father's wife, and who cared for [the parties' child] for six (6) months starting over a year before the trial, to resolve the entire dispute. He misinterpreted her testimony. He dismissed all other witnesses' testimony as unreliable. Thus, the proper result in this custody case was not plainly obvious to the court.

"* * * It is reasonably probable that the court, even subconsciously, was impressed by the father's strategy because it so closely paralleled the court's own perception of a proper approach in the case. Under these circumstances, the court's conflict of interest substantially affected the mother's rights."

ORCP 64 B(1) provides that a new trial may be granted when there is an:

"[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court, or abuse of discretion, by which such party was prevented from having a fair trial."

Whatever may have been the subconscious effect on Judge Reynolds because of his meeting with father, that event has no influence on our *de novo* review of what is in the best interests of child. Although we do not have the benefit of "eye-balling" the witnesses for purposes of assessing credibility as did the trial court, our evaluation of the record as a whole, without being influenced by Judge Reynolds's credibility determinations, has resulted in our agreement with his ultimate decision. Our *de novo* review gives mother a fair trial without the influence of Judge Reynolds's contact with father. Consequently, it is not clear why mother should prevail on her motion for a new trial in light of the ground that she relies on, our standard of review on appeal and our decision on the merits regarding custody.

■ In addition, father argues that in light of what mother knew before trial and her delay in filing her motion until after she received an adverse decision, she has effectively waived any right to a new trial under ORCP 64 B. A

"waiver" is the "intentional relinquishment of a known right." *Waterway Terminals v. P.S. Lord*, 242 Or 1, 26, 406 P2d 556 (1965). In support of his argument, father relies on mother's affidavit that she knew before trial that "Judge Reynolds may have talked with [father] about this case," and that her attorney had advised her "that if I did not want to proceed that morning, that I could probably get a different trial date with a different judge." Her attorney averred that he told mother before trial that "if she was uncomfortable with Judge Reynolds, we could seek to get a new judge if she wanted to."

■ Father's argument has persuasive force. If mother had raised the matter to Judge Reynolds before trial, then he could have ruled on whether to continue as the presiding judge. Such an inquiry would have given him the ability to explore the matter with father and determine the nature of any contact that occurred. Moreover, it is noteworthy that mother did not move for a new trial until April 14, 41 days after the trial court announced its decision on custody. Her affidavit merely says that "[s]ince that time [February 28, the date of trial], I have learned that [father] did, in fact, see Judge Reynolds about this case." It does not tell us what information she had before February 28 and what new information, if any, she obtained after February 28 or whether she acquired any new information before March 4, the date the trial court announced its decision. At best, her affidavit informs us that she *"thought* Judge Reynolds may have talked with [father] about this case" before trial and that after the trial, she *"learned"* that he "in fact" saw Reynolds before the trial. The issue is whether on these facts, her failure to inquire of Judge Reynolds or to move to recuse him constitutes an implicit waiver of the irregularity she claims occurred in the trial.

It is clear that mother believed before trial that contact could have occurred between Reynolds and father. She brought the matter to the attention of her attorney, and he told her that he would bring the matter to the attention of Judge Reynolds, if she desired. With that advice in mind, she elected to proceed to trial with Judge Reynolds presiding. In sum, her election was intentional and was done with the

knowledge that she "thought" that father had consulted with him.[3]

The dissent believes that mother received confirmation after the trial of the fact that father had contact with Judge Reynolds before trial, and therefore, there could be no waiver of her right to raise the matter to the court before trial. It characterizes her pretrial knowledge of father's contact as mere speculation. It follows, according to the dissent, that mother's election was not made knowingly. What the dissent's reasoning does not confront is the uncontroverted fact that mother was aware of her procedural right to make inquiry of the trial court, regardless of the degree of certainty about her belief. It was with that knowledge that she decided to proceed to trial.[4]

Moreover, as we have pointed out, the ground for new trial on which mother bases her claim of an irregularity in the proceedings did not impact the way in which the trial was conducted or the admission of evidence. Rather, mother's argument is directed to the ability of the decision-maker to act impartially. That problem, if it existed, is remedied by our *de novo* review.[5] Under all the circumstances, we conclude that mother has not demonstrated an irregularity that prevented a fair trial. Judge Olsen did not err when he denied mother's ORCP 64 B(1) motion.

Remanded for recalculation of child support obligations; otherwise affirmed.

---

[3] There is no evidence that Judge Reynolds was ever an attorney of record for father. ORS 14.210(1) provides that a judge shall not act as such when he or she has been an attorney in the action for any party. ORS 14.210(2) authorizes the parties to waive the disqualification of the judge under subsection (1). The statute recognizes a legislative policy regarding applicability of the doctrine of waiver of the right to recuse a judge.

[4] Mother does not claim that Judge Reynold's decision was prompted by his own pecuniary or self-interests or even that his ruling resulted from a conscious bias. She argues that his decision-making process was affected subconsciously by the prior contact because father tried his case in the manner that Judge Reynolds would have, had he been father's lawyer. Therefore, the dissent's analogy of this case to a case where "structural error" occurs when a judge has a financial interest in the outcome of the case is misplaced.

[5] Equally mysterious is the dissent's assertion that our *de novo* review is affected by the trial judge's contact with father. We find the daycare provider's testimony persuasive because it is supported by records made contemporaneously with the events recorded.

**ARMSTRONG, J.,** dissenting.

I disagree with the majority's conclusion that the trial court did not abuse its discretion in denying mother's motion for a new trial under ORCP 64 B(1). Although it is true that mother had the burden to show that an irregularity in the custody proceeding prevented her from receiving a fair trial, I believe that she met that burden simply by showing that the trial judge who decided the custody dispute had acted as an attorney for father in that matter.[1] In other words, the judge's earlier involvement with father was a structural defect in the trial proceedings that, in and of itself, prevented mother from receiving a fair trial.

The Code of Judicial Conduct establishes how a judge should act in order to maintain the integrity of the judicial system. Judicial Rule 2-106 provides, in part:

"(A) A judge *shall* disqualify himself or herself in a proceeding in which the judge's impartiality reasonably may be questioned, including but not limited to instances when

"\* \* \* \* \*

"(2) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously was associated served during the association as a lawyer in the matter, or the judge or the lawyer has been a material witness in the matter;

"\* \* \* \* \*

"(D) A judge who is disqualified under this rule may, rather than withdraw from the proceeding, disclose on the record the basis of the disqualification. If, after such disclosure, the parties all agree in writing or on the record that the judge's relationship is immaterial \* \* \* the judge may participate in the proceeding. Any writing, signed by or on behalf of all parties, shall be incorporated in the record of the proceeding."

---

[1] The judge who decided the custody dispute is not the one who denied mother's motion for a new trial. The first judge withdrew from the case once mother's motion brought to his attention the fact that father had consulted with him about the parties' child, a fact that he had not remembered during the custody proceeding.

(Emphasis added.) JR 2-106 also requires a judge who has a financial interest in the subject matter in controversy to disqualify himself or herself, regardless of whether a party has so requested, unless the parties, after full disclosure, agree to waive the requirement.

The Supreme Court has explained the importance of the rule:

"The purpose and importance of [JR 2-106's] admonition, *viz.*, 'A judge [shall] disqualify himself or herself in a proceeding in which the judge's impartiality [may] reasonably be questioned * * *,' should be evident, *because not only the fact but also the appearance of impartiality are the very currency of judicial legitimacy. See In re Fadeley*, [310 Or 548, 563, 802 P2d 31 (1990)] ('The stake of the public in a judiciary that is both honest in fact and honest in appearance is profound. A democratic society that, like ours, leaves many of its final decisions, both constitutional and otherwise, to its judiciary is totally dependent on the scrupulous integrity of that judiciary.') * * * Indeed, the rules of judicial conduct are fashioned, in part, for the purpose of maintaining public confidence in the legal system, by imposing a system of ethical restraints that will further both the fact and the appearance of a system committed to providing equal justice under law."

*In re Schenck*, 318 Or 402, 407, 870 P2d 185 (1994) (emphasis added). The importance of the rule is also indicated by the fact that it cannot be deemed waived but, rather, can be waived only after full disclosure on the record and with the written or recorded consent of the parties. For those reasons, I conclude that the *appearance* of partiality alone is, in this case, sufficient to establish that the judge's participation in the case denied mother a fair trial.

In that regard, this case is not unlike one in which a judge has an undisclosed financial interest in the subject matter in controversy. The United States Supreme Court has held that such an interest strikes at the heart of due process, regardless of whether there is evidence of actual misconduct or bias. *Commonwealth Corp. v. Casualty Co.*, 393 US 145, 89 S Ct 337, 21 L Ed 2d 301 (1968). The court stated that "any tribunal permitted by law to try cases and controversies not

only must be unbiased *but also must avoid even the appearance of bias.*" 393 US at 150 (emphasis added).

Here, the fact that the trial judge had advised father on the very subject of the controversy before him strikes at the heart of judicial integrity. Even though the judge did not remember meeting with father, the fact that he had done so and the fact that it was in regard to the very matter before him compels a conclusion that mother was denied a fair trial, because she did not receive a trial before a judge whose impartiality could not reasonably be questioned. She was not required to show that the judge's representation of father on the custody issue may have affected his decisions as a judge on that issue. It is enough for purposes of ORCP 64 B(1) that it could have had that effect.

Because the judge's representation of father materially affected mother's substantial rights by denying her a trial before an impartial judge, the court was required to grant mother's motion for a new trial unless countervailing considerations provided a basis for it to exercise its discretion to deny the motion. *See Garber v. Martin*, 261 Or 410, 411, 494 P2d 858 (1972). Father contends that mother's awareness before the custody trial that there might be a question about whether the judge should sit on the case is such a consideration. I do not believe that it is.

Before trial, mother knew only that her former attorney had withdrawn from the case because of a conflict in his office, that the judge had previously been an attorney in that office, and that the conflict could have been due to the judge having spoken to father about the case. When given that information the morning of trial, mother's attorney told her that the judge was a person who would be fair and who would disclose a conflict and disqualify himself if he knew of it. On that basis, mother proceeded with the trial.

Mother's failure to act on her speculation that father could have spoken to the judge about custody of the parties' child does not constitute a waiver of her right to a trial before an impartial judge. An effective waiver requires knowledge of the relevant facts, which mother lacked. Hence, I do not believe that mother's failure to raise a question about the judge's qualification to sit on the case provides a basis on

which the court could exercise its discretion to deny mother's motion for a new trial.[2]

The majority suggests that it does not matter whether there was an irregularity in the proceeding that might entitle mother to a new trial, because that irregularity did not affect the record that was created below, and our *de novo* review of that record moots its effect. There is both a practical and a logical flaw to that approach.

As a practical matter, we give great deference to trial court findings when we conduct a *de novo* review in a case, because we are not in the same position as the trial court to evaluate the credibility of witnesses. Here, as the trial court acknowledged, the parties presented sharply differing accounts of the relevant events. The trial court purported to resolve that difference by focusing on the testimony of a daycare provider, but the weight to be assigned that testimony necessarily would turn on an evaluation of her credibility in conjunction with that of the other witnesses. Even though we may conduct a *de novo* review of all of the testimony, it is difficult for us to avoid being affected by the trial court's view of the evidence.

Furthermore, our task is *to review* the trial court's decision. The litigants are entitled to have an initial decision made by an impartial trial judge. The *de novo* review to which all litigants are entitled is not an adequate substitute for the impartial initial decision to which all litigants are also entitled.

The latter point bears, in turn, on what I believe is the logical flaw in the majority's approach. If the majority is

---

[2] ORS 14.210 provides additional support for my position. It provides that a party is deemed to have waived the right to disqualify a judge who has served as an attorney in the proceeding if the party does not move under ORS chapter 14 to replace the judge. Significantly, such a waiver will occur *only* when the parties are aware of that basis to disqualify the judge, because the parties necessarily will know who has appeared as an attorney in the case, because appearance, for those purposes, means the filing of written pleadings in it. *See* ORS 9.310 to ORS 9.390. Here, mother did *not* know that father had consulted with the trial judge about custody of the parties' child, so she did not know that there was a basis on which to disqualify him from hearing the custody matter. Both ORS 14.210 and general waiver principles require that a waiver be knowing to be effective. That requirement is missing in this case.

correct that our *de novo* review eliminates any harmful effect from the irregularity of having father's former attorney serve as the trial judge in this proceeding, then it follows that the trial judge who ruled on the new trial motion could deny it on the same ground, that is, on the ground that mother could appeal the decision and obtain a *de novo* review of it, so any irregularity that did not affect the quality of that review could not provide a ground for a new trial. I am unaware of any case that has held that that would be a proper ground for a trial court to deny a new trial motion, so I question whether it can provide a ground for us to affirm the trial court's decision to deny such a motion. Whether the trial court erred in denying mother's new trial motion should be evaluated without regard to whether the irregularity on which the motion was based affected our ability to conduct a *de novo* review of the trial court's decision on the merits.

For the foregoing reasons, I believe that the trial court abused its discretion in denying mother's motion for a new trial. I dissent from the majority's contrary conclusion.

De Muniz, Haselton and Wollheim, JJ., join in this dissent.