Argued and submitted May 20, reversed July 24, 2002

In the Matter of the Marriage of

Catherine Dewell COLSON,
*Appellant,*

*and*

Thomas Hansen PEIL,
*Respondent.*

99-4327-D-2; A115427

51 P3d 607

Laura Graser argued the cause and filed the briefs for appellant.

Charles Kochlacs argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

BREWER, J.

**BREWER, J.**

Mother appeals from a judgment modifying a dissolution judgment by changing custody of the parties' children from mother to father. Mother assigns error to the trial court's determinations that a substantial change of circumstances had occurred since the dissolution trial and that a change of custody would serve the children's best interests. On *de novo* review, ORS 19.415(3), we reverse.

The parties' dissolution action was tried in December 2000. At that time, mother and father were in their early forties and their children, a daughter and son, were 13 and 10, respectively. The parties' relationship began in high school in Missouri, and they lived together beginning in 1987. They were married in 1990 and separated in December 1999. They had lived in Oregon since 1994. Mother generally was a stay-at-home parent and was the primary caretaker of the children. Mother's only post-high school education consisted of a cooking course and some writing classes, and her only employment during the marriage consisted of several months' restaurant work for a few hours per day. At trial, mother gave the following testimony concerning her career objectives:

> "Well, I've been taking a lot of writing classes over the past four years and I would like to be—write about food, I'd like to be a food writer. I'd like to go back to school and study journalism and write freelance food articles for magazines, do reviews, whatever."

At the time of the dissolution trial, father was a handyman after having spent several years attending college. The parties' family income—and lifestyle—had been subsidized throughout their marriage by frequent monetary gifts from father's parents.

Although much of the evidence at the dissolution trial centered on financial issues, father did seek custody of the children. It was apparent, however, that father's primary concern was restricting mother's ability to move from Oregon to St. Louis, Missouri. Mother testified that she might move to Missouri with the children. She gave the following reasons: (1) the parties were raised there; (2) their extended families

still lived there; (3) mother had a strong network of friends there; (4) she hoped to go back to school, and her mother could help with the children while she was in class; and (5) there would be better educational opportunities for daughter, a promising ballet dancer. Father objected to mother moving the children from Oregon.

At the conclusion of the dissolution trial, the trial court ruled from the bench, finding that both parents loved the children but awarding custody to mother. The court structured a parenting plan based on the parents living in Jackson County and ordered mother to provide father with 90-day written notice of her intent to move outside the county. The court also awarded child support and five years' spousal support to mother. The court stated that its decision with respect to disputed financial issues was affected by its belief that father's "testimony about his income has been evasive, not forthcoming." The dissolution judgment included the foregoing provisions but, for reasons that are not entirely clear, was not entered until April 26, 2001.

On June 26, 2001, father filed a motion and order to show cause seeking a change of custody and setting the hearing date for July 30, 2001. Father's supporting affidavit explained the reasons for his request:

> "Custody was awarded to mother and parenting time to me based upon both parents living in Jackson County. I believe mother intends to move, and I believe that it necessitates a modification of the custody and parenting time order. The children have lived in Ashland most of their lives, and have gone to school here, and have friends here. [Mother] gave me a '90 day notice' in February of 2001. I believe she is simply going to move at some point without further notice.
>
> "I do not believe it is in the best interests of the children to move, and I believe any such move would be a substantial change of circumstances based upon the language of the [dissolution judgment]. In addition, [mother] withheld [our son] from school for 35 days this year, and now indicates she will home school him, which I believe is inappropriate."

The case went to trial as scheduled, and father's evidence followed the theme of his affidavit. The son's teacher

testified that the son was in his fourth and fifth grade class during the preceding school year. He testified that the son has a learning disability and especially had difficulty with math. With respect to the son's attendance and progress, the teacher explained:

"Q. Okay. In the past year, has there been an attendance problem for [the son]?

"A. I'm struggling over the word 'problem.' There has been—I've * * * had some concerns about his attendance, yes.

"Q. What's the attendance been like?

"A. He's—he was absent about 25, 26 percent of the time.

"Q. In your opinion, has that [a]ffected his learning?

"A. It's hard to tell. I've—in my opinion, yes, at least it's [a]ffected the program and our ability to deliver the program.

"Q. And I assume [a]ffected in a negative sense?

"A. [A]ffected in not—not letting us make the progress we'd like to make. Not—not a—negative, but not a progressive forward sense."

The teacher described the son as a "delightful child" who makes friends easily and is physically adept. According to the teacher, the son also "is very willing to listen in a situation where he needs listening to and redirectional behavior." In the past, the son had "language processing * * * deficiencies," but that concern "went away this year."

In the spring of 2001, "at the impetus of his parents," the son talked to the teacher about his reluctance to come to school. The son said that he did not like coming to school because it was "hard work for him mentally," but when he did come to school, he was "very positive and willing and participated." Although the school does not issue letter grades, the son's progress was acceptable. When asked how he thought the son would adjust to a move out of state, the teacher testified:

'[M]ostly what I think is that children are very resilient and [the son] is a very resilient child. I know from talking to

him that he doesn't want to move, and * * * I know that his peers will miss him greatly. But, I think in the long run, he would—he would be resilient."

The teacher believed that the son needs a new direction in his educational plan, whether at his current school or at a different school.

Father testified that he became aware of a school attendance problem after the dissolution trial in December. He said that mother told him that the son did not like school and that she did not make him go to school a couple of times. Father also testified that mother had mentioned "the possibility" of home schooling the son. Although father testified that he believed that the son should be regularly attending school, he did not testify that he had actually complained to mother about the son's school attendance or that mother had refused to address the problem. Father also testified that he did not want the children to move to Missouri but that he would move to Missouri as well if the court authorized the move.

Mother testified that she wanted to move to St. Louis with the children. Her reasons were virtually identical to the reasons that she gave in her testimony at the dissolution trial. Mother had the same career objective: she wanted to become a food magazine writer, but she realized that she would need to supplement her income by working as a private chef. Mother also recognized that her window of opportunity was narrow because her spousal support award was of limited duration. She explained that she could enter a two-year working writer's program at a St. Louis area college that would prepare her for a food writing career. She testified that no comparable program existed in southern Oregon. Mother also expressed concern about the daughter's progress as a dancer. She said that the daughter was falling behind ballet students with similar potential, and she repeated her trial testimony that the daughter could receive more extensive and suitable training in St. Louis than in southern Oregon.

It is not entirely clear when during the 2000-01 school year the son's school attendance began to slip. However, mother testified that the son's dislike of school grew

during the period immediately following the dissolution. Mother testified that she had encouraged father to volunteer in her place in the son's class during the school year, and she opined that her absence from the classroom might have played a part in the son's increased dislike of school. She stated that she wished she could change that. The teacher was frequently absent due to a family health problem, and there often were substitute teachers in the class. Because the son seemed depressed and said that he hated school, mother did not always make him go to school during that period. However, the son always did his homework, even when he did not go to school. Overall, the son's school performance was "fine," although the absences were a problem. In March, the son's teacher called mother about her son's dislike of school. Although the son was already receiving counseling to deal with issues relating to the dissolution, at that point the son's counselor began to address the son's dislike of school.

Mother believed that the proposed move to St. Louis especially would be beneficial to the son, because she planned to enroll him in a more "traditional" school that she felt would better serve his academic needs. Mother believed that, on balance, the move would benefit both children and also would enhance her ability to support the family. She testified, however, that she would not move to St. Louis if the court did not authorize the children to move.

At the conclusion of mother's testimony, the court engaged her in the following colloquy:

"THE COURT:  * * * Your testimony about [your son's] problem with the school attendance seemed a little vague, and so I'd like to understand it in a more specific way. My way of thinking about it is, you get up in the morning and it's a day to go to school, you've got to get to school. That didn't happen. Give me an idea of why that didn't happen?

"* * * * *

"THE COURT:   I mean for him to say, 'My teacher is having personal problems,' why would that prevent him from going to school?

"[MOTHER]:   He would not say, 'My teacher has personal problems.' He would come home and tell me, '[My teacher] got angry at me for this, [my teacher] got angry—

[my teacher] is mad at me, Mom. [My teacher] is always mad at me.'

"And I questioned some of the other parents and tried to figure out why he—usually he would say he hated to go to school, but he would go. And this was different. This was, 'I do not want to go. I hate it there. I hate school. I hate my teacher, my teacher hates me.' And that was almost on a daily basis, and I just felt like something was wrong and I—I couldn't get to the bottom of it.

"THE COURT: Nevertheless, why didn't you just take him to school? I don't—I can't follow that. What's the decision-making progress or the impediment? He's a kid and you're a parent and school—and you know where it is, why didn't you just get him to school?

"[MOTHER]: Because I felt like he would be better off at home. If he—if he hated school that much, I felt like he would be better off at home. He could do work at home, and we did reading—I made him read, I made him get his homework done. If he could still get what he needed to get done at home and was willing to do it, then I would rather keep him home, because something was going on that was * * * really upsetting him."

The son's counselor also testified. He met with the son five times from March through early July 2001. Both parents were "very involved." The counselor testified that the son had "minimally processed" his parents' dissolution. The son wanted his parents to "be back together" but realized that "that probably wasn't going to happen." The counselor believed that the son had separation anxiety and that he "preferred spending more time with his mother." The counselor described the contingent move to St. Louis as a stressful event but opined that the son could handle the stress as long as he had support from his extended family and continued support from mother. The court then engaged in the following colloquy with the counselor:

"THE COURT: * * * [Did you counsel] either or both parents about how to deal with [their son's increased anxiety about school], as to what would be appropriate for him?

"[COUNSELOR]: Yes.

"THE COURT: And what was that?

"[COUNSELOR]: Well, I recommended consistency. That—recognizing that the problem was there, but that they—you know, that the rules, family values and structure and all of the issues about boundaries shouldn't be just cast aside, but that they remain consistent and—and discipline and be consistent in showing their love and support.

"THE COURT: All right. Did you see any reason he shouldn't have gone to school?

"[COUNSELOR]: No."

At the close of the hearing, the court took the matter under advisement. In its written opinion, the court explained its decision to change custody to father:

"[Mother] testified to her plans. She wants to return to the college she attended when she was 19 years old. She is now 43 years old. There she will pursue a course of study allowing her to become qualified to be a 'food writer.' She had done some unspecified 'food writing' in 1995. She also intends to be a 'private chef.' Although qualified to be a private chef now, she has made no effort to do that kind of work since the decree. [Mother] projects this plan to work because she would be living with or near her mother, in the suburb where she grew up, near her best friend * * *.

"[Mother's] plan to work herself into one of what must be only a few very specific jobs appears on the surface to be unrealistic. Nevertheless it is her dream. Pursuing one's dream becomes relevant to these proceedings only if it impacts the best interests of the children.

"[The son] had a reaction to the divorce of his parents which manifested itself, among other ways, in his stating a dislike of school. His mother allowed him to miss 25% of the school year. Her explanation for allowing these absences was that it was due to personal problems of the teacher, the many substitute teachers, her lack of involvement in the school to allow [father] to become more involved, and adjustment to the divorce.

"The psychologist who testified for mother * * * testified what [the son] had needed was consistency in parenting.

"[Mother's] vague plan for her future is highly problematic. She does not choose a field of work as her goal; she chooses a very specific, limited in number position. She does not want to work in the food industry in general, because

she has done that. She does not have an alternative plan. She is unable to convince the Court of her ability to hit so small a target. Her testimony and her history to date convince this judge only that she will continue to suffer frustrations and drifting in her effort to find a vocation.

"Mother did not provide consistency in parenting [the son] in her inexcusable allowance of absences from school. Her plan to take her children on her odyssey is certain to introduce inconsistency into their lives at a time when they need stability and clear guidance.

"These parenting problems of mother constitute a change of circumstances justifying a change of custody to father. Both parties are loving parents. Father can also provide the consistency needed."

The court reversed the custody arrangement and granted mother the same parenting time schedule father received in the dissolution judgment. Mother appeals from the ensuing modification judgment. She contends that the circumstances on which the trial court relied do not constitute a change of circumstances sufficient to justify modification and that modification is not in the children's best interests.

Father had the burden to show that there had been a substantial change of circumstances since the time of the original custody award. *State ex rel Johnson v. Bail*, 325 Or 392, 397, 938 P2d 209 (1997); *Teel-King and King*, 149 Or App 426, 429, 944 P2d 323 (1997), *rev den* 327 Or 82 (1998). The change of circumstances rule "avoid[s] repeated litigation over custody and * * * provide[s] a stable environment for children." *Ortiz and Ortiz*, 310 Or 644, 649, 801 P2d 767 (1990). "Consistent with that purpose, when a motion for modification of custody is made within a short time after the last custody decision, 'the asserted change of circumstances and detriment to the child must be more closely scrutinized by the court.' " *Heuberger and Heuberger*, 155 Or App 310, 313-14, 963 P2d 153, *rev den* 328 Or 40 (1998) (quoting *Atkinson and Atkinson*, 38 Or App 375, 379, 590 P2d 279, *rev den* 286 Or 1 (1979)). It is not enough to prove that something has changed. *Teel-King*, 149 Or App at 429. The moving party must prove that the changed condition relates to a parent's capacity to care for the children properly. *Bail*, 325 Or at 397. Moreover, to qualify as a basis for custody modification, the

change must be unanticipated. *Dillard and Dillard*, 179 Or App 24, 30-31, 39 P3d 230 (2002). It is only if the moving party demonstrates a substantial change of circumstances that the court reaches the second step of analysis—whether the modification is in the children's best interests. *Id.* at 30.

■     We conclude that the trial court improperly relied on mother's career plans as a change of circumstances. Her career goals in July 2001 were identical to her plans at the time of the dissolution trial fewer than eight months earlier. Accordingly, they were not in any sense unanticipated when the court initially awarded custody of the children to mother. Moreover, mother's decision to pursue a two-year vocational course rather than a four-year college degree appears to be prudent. In the dissolution judgment, the court awarded mother only a five-year term of spousal support, and she needs training in order to become self-sufficient at a level not unreasonably disproportionate to the lifestyle the parties enjoyed during the marriage. Mother testified at the dissolution trial that realistically she could not become self-supporting as a "private chef" while living in southern Oregon. Nor was there any evidence to the contrary. In addition, there was no evidence at the dissolution trial or in this proceeding that mother currently is qualified for any work outside the food preparation industry or that she would be better suited for employment different from that to which she aspires. Furthermore, mother's plans do not reflect adversely on her capacity to care for the children. She is and always has been their primary caregiver. There is nothing in the record to suggest that mother will be unable to provide for the children or that they will be harmed in any way by her choice. In short, there is no evidence to support the trial court's determination that mother's career plan amounts to a "parenting problem."

■     Moreover, the possibility that mother would move to Missouri to pursue her career plan also was anticipated eight months earlier. An out-of-state move that was contemplated at the time of the last custody decision is not a change of circumstances unless it has had or will adversely affect the capability of one or both of the parents to care for the children. *Dillard*, 179 Or App at 31. There is evidence that the son would prefer not to move, that father loves the children, and that they would miss him if they moved and he remained

in Oregon. However, those factors alone are not decisive. *See Dillard*, 179 Or App at 31; *see also Duckett and Duckett*, 137 Or App 446, 449, 905 P2d 1170 (1995), *rev den* 322 Or 644 (1996) ("If maintaining a close geographic relationship with both parents were *controlling*, no primary parent would be allowed to move away over the objection of the other parent without losing custody of the child.") (emphasis in original). The evidence also shows that the son is resilient and could benefit from a change in school environment, that the daughter loves ballet and will be better able to fulfill her potential as a dancer in Missouri, and that mother has a strong support network in Missouri that will encourage her career and personal development in the wake of the dissolution. Moreover, the record reflects that father's family also lives in Missouri and that father is willing, albeit reluctantly, to relocate to Missouri if mother and the children move there. When the foregoing factors are considered together with the importance of maintaining the stability of the primary parental relationship, *see Duckett*, 137 Or App at 449, the evidence shows that the proposed move would not constitute a substantial change of circumstances.

■ The trial court also took mother to task for permitting the son to miss 25 percent of the 2000-01 school year. The court was right to be concerned. However, that problem must be viewed in perspective. The son has a learning disability and was distraught over the dissolution of his parents' marriage. Arguably, mother acted compassionately, if indulgently, in allowing him that many absences. Moreover, the number of absences was not the result of mother simply abdicating responsibility in that regard. Mother had the son talk to the teacher, and she directed the son's counselor to the issue. Although the son's resulting academic progress was not optimal, neither did he regress. Despite the absences, the son is well-adjusted in his peer relationships, and his language deficiencies apparently were resolved during the school year. Moreover, the son's teacher acknowledged that the son needs a change in academic focus, whether at his current school or in a new environment. In apparent recognition of that problem, mother wants to place the son in a more traditional school setting. In short, although the son's poor school attendance poses a concern, it is not of such a nature or

magnitude as to constitute a change of circumstances sufficient to justify a change of custody. *See Heuberger*, 155 Or App at 315-17 (holding that the mother's substantial contribution to discord over the father's parenting time did not rise to the level necessary to constitute a change of circumstances).

■ Finally, even if mother's proposed move and her handling of the son's school attendance constituted changes of circumstance, they do not establish that a change of custody would serve the children's best interests. The trial court commendably emphasized the children's need for consistency. However, that concept is much broader than the issue of the son's school attendance record for the year immediately after the dissolution. It also includes the need for stability in the children's home environment and in their relationship with mother, their primary parent. *See, e.g., Johnson and Johnson*, 154 Or App 560, 565-66, 962 P2d 752 (1998) (declining to change custody—in part, because of importance of stability in home environment—where the custodial parent had been convicted of possession of drugs and endangering children). There is no evidence that mother's parenting of the daughter has been in any way deficient or that a change of custody would be in the daughter's best interest. Nor is there evidence that a change would be in the son's best interests. The son's counselor testified that, if anything, the son's dislike of school was the result of anxiety at being separated from mother during a traumatic period in his life. Although the son is close to both parents, he is closer to mother. There is no indication that he has been harmed in any serious way by mother's conduct. In sum, there is no evidence that the children's need for consistency would be advanced by removing them from mother's custody at this time in their lives. In our view of the record, the opposite is true. A change of custody would not serve the children's best interests.

Reversed.