Argued and submitted September 28, 2004, reversed and remanded
November 9, 2005

In the Matter of the Marriage of

Laurie M. HAMILTON-WALLER,
nka Laurie M. Hamilton,
*Appellant,*

*and*

George Daniel WALLER,
*Respondent.*

DR0203639; A120424

123 P3d 310

Jacqueline L. Koch argued the cause for appellant. With her on the brief were Koch & Deering, Duane K. Petrowsky, and McKeown & Brindle, P.C.

No appearance for respondent.

Before Landau, Presiding Judge, and Brewer, Chief Judge,* and Deits, Judge pro tempore.

DEITS, J. pro tempore.

Landau, P. J., dissenting.

---

* Brewer, C. J., *vice* Leeson, J. pro tempore.

## DEITS, J. pro tempore

This is a child custody case in which mother appeals a judgment changing custody of two of the parties' children to father in the event that mother moves to Holland. On *de novo* review, ORS 19.415(3), we reverse.

Mother and father were married 14 years and have three children. In September 2001, mother told father that she wanted to dissolve their marriage and that she intended to move to Holland the following spring, taking their oldest child, A, with her and leaving their younger children, P and R, with father. Ultimately, however, in a stipulated decree of dissolution of marriage entered on July 13, 2002, mother was awarded custody of the two younger children, P, who was then 11 years old, and R, who was five, and father was awarded custody of the oldest child, A, who was 16. Less than a month later, on August 2, 2002, mother notified father that she intended to move to Holland with P and R, in order to live with her fiancé, Ritter, who is Dutch. Father responded by seeking to change custody of P and R.[1]

At the hearing on father's motion, both parties testified, as did Bonnvier, a custody evaluator hired by father.[2] Neither party indicated that the other was not a good parent; nor did the custody evaluator make any such statement. The hearing focused almost entirely on the effects of mother's proposed move on all three children and on mother and father. The custody evaluator testified that, in her opinion, father should be given custody of P and R if mother decided to move to Holland. However, mother testified that she would not move to Holland if she could not take P and R with her.

After hearing the testimony of several individuals, including both father and mother, mother's fiancé, and the

---

[1] Mother did not seek to have A move to Holland with her. Custody of A was not disputed at trial nor is it an issue on appeal. He remains in father's custody.

[2] At the hearing, father offered the custody evaluator's report into evidence, but mother objected to its admission on hearsay grounds. Based on a conversation about the law that had been conducted in chambers, the trial court excluded the report. The evaluator then read her entire report into the record. As did the trial court, we note that such an approach creates quite an inconvenience for the court. We encourage appropriate stipulations to evidence in such circumstances.

custody evaluator, the trial court concluded that mother's proposed move would constitute a substantial change of circumstances and that it was in the best interests of the two children to change custody of them to father if mother moved to Holland. Under the trial court's decision, if mother does not move to Holland, she will retain custody of the two children. Mother appeals, arguing that the trial court erred in concluding that father had sufficiently established a substantial change of circumstances and in concluding that it was in the best interests of the children to change custody to father in the event that mother chose to move. Father has not appeared on appeal.

We note at the outset that "relocation cases" such as this are among the most difficult cases that the courts are called upon to decide.[3] This is true both factually and legally. It is difficult to formulate a legal test to govern when it is appropriate to allow a custodial parent to move with a child. It is also hard to apply a standard formula to this type of case because there are numerous competing interests and issues and so many variations in particular circumstances.

It is undeniable that the dissolution of a marriage drastically changes a family. The relationship of the parents and children must necessarily change when a dissolution occurs. Further, as the lives of all the family members change in the years after a dissolution, numerous competing interests frequently arise that simply cannot all be satisfied. The custodial parent has an interest in moving on with his or her life and, when finances or personal relationships make it desirable to move, in being able to move. The custodial parent also has an interest in making important decisions regarding

---

[3] The struggle to find the best approach to "move away" cases is not limited to Oregon or to the judicial arena. *E.g.*, *Ciesluk and Ciesluk*, 113 P3d 135 (Colo 2005); *Bates v. Tesar*, 81 SW3d 411 (Tex App 2002); *Baures v. Lewis*, 167 NJ 91, 770 A2d 214 (2001); *Ireland v. Ireland*, 246 Conn 413, 717 A2d 676 (1998); *Burgess v. Burgess*, 13 Cal 4th 25, 51 Cal Rptr 2d 444, 913 P2d 473 (1996); *Tropea v. Tropea*, 87 NY2d 727, 642 NYS2d 575, 665 NE2d 145 (1996); Arthur B. LaFrance, *Child Custody and Relocation: A Constitutional Perspective*, 34 U Louisville J Fam L 1 (1996) (reviewing in detail how child custody relocation cases have been analyzed nationally and suggesting that courts should place more emphasis on the constitutional rights of custodial parents to move); Carol S. Bruch and Janet M. Bowermaster, *The Relocation of Children and Custodial Parents: Public Policy, Past and Present*, 30 Fam L Q 245 (1996).

the children, such as where they are going to live. *See Ortiz and Ortiz*, 310 Or 644, 649, 801 P2d 767 (1990) (custodial parent has the primary rights and responsibilities for the child). On the other hand, the noncustodial parent has an interest in having the opportunity to maintain a meaningful relationship with his or her children and having reasonable access to and time with the children to maintain that relationship. *See* ORS 107.149 (recognizing state policy of maintaining contact with both parents after dissolution). Finally, and perhaps of most importance, the children have an interest in having a situation that allows the optimum relationship with each parent under the circumstances and is in their overall best interests. *See* ORS 107.137(1) (primary consideration in custody determinations is best interests of the children).

All state courts must deal with relocation cases, and the various states have taken a number of different approaches. Some states have adopted statutory standards that govern these decisions; others, like Oregon, have developed the appropriate analysis primarily through case law. The approaches developed in case law have varied considerably. The factors identified by the various courts to be used in deciding relocation cases have common threads but also significant differences. The interests that the courts have found to be predominant also vary from state to state. Significantly, some jurisdictions require the custodial parent to establish that a move is appropriate, while others, like Oregon, require the noncustodial parent to establish that a change in custody is appropriate. We have found two generalizations that can be drawn from the case law of other jurisdictions: (1) in most states, the predominant consideration is the best interests of the children, and (2) in most states, the ultimate decision usually is driven by the facts.

Those generalizations are borne out in Oregon case law. In fact, perhaps more than in any other kind of case, the analysis in this type of case often appears to be, and frankly is, highly dependent on the facts of the case. *See Ortiz*, 310 Or at 649 n 5 (observing that the amount of change necessary to justify modification of custody varies with the facts of each case); *Meier and Meier*, 286 Or 437, 447, 595 P2d 474 (1979) (recognizing that the "best interests" test does not provide as

specific a guide to trial courts as might be most helpful to them). That is so because what is in the "best interests" of one child will often differ dramatically from what is in the "best interests" of another child, even when it appears that surrounding circumstances are similar: the particular personality, experiences, strengths, weaknesses, and needs of each child must be considered within that child's own context of relationships, circumstances, and events. In addition, societal conceptions of what is in the best interests of children, generally and particularly, are not static but have evolved over time, and will no doubt continue to evolve.[4] Finally, the cases reflect the reality that, no matter how much evidence we are provided, courts are poor substitutes for the ideal arbiters of children's best interests: the family members who know them and their circumstances from firsthand experience.

For all those reasons, it is important to bear in mind that what may at first appear to be inconsistent statements of the standards applied to these cases, or anomalous results, may in fact be, at least in part, a function of subtle differences in a myriad of factual circumstances that may not be apparent from the face of a written opinion. Moreover, it is especially unsuitable in this area of the law simply to "fact match" and attempt to resolve cases involving a proposed move by a custodial parent on the basis of the resolution of a superficially similar prior case.

With those cautions in mind, we review some of the general principles that Oregon courts should follow in these cases. The cardinal guiding principle in custody determinations has been long recognized and is easily stated: custody determinations must be made based on the best interests of the child. *See* ORS 107.137(1) (in determining custody, including custody modification under ORS 107.135, "the

---

[4] For example, until the early 1960s, courts—presumably acting on perceived societal wisdom of the times—routinely favored granting custody of children of "tender years" to mothers simply on the basis of the fact that they were mothers. *E.g.*, *Osko v. Osko*, 230 Or 247, 250, 369 P2d 737 (1962) ("[M]otherhood is a factor to be given great weight."); *Shrout v. Shrout*, 224 Or 521, 524, 356 P2d 935 (1960) ("[C]hildren of tender years, particularly girls, should be awarded to the custody of the mother unless she is morally unfit."). Under Oregon law, courts now are to give preference to neither parent based only on gender. ORS 107.137(4).

court shall give primary consideration to the best interests and welfare of the child"). Although application of that principle to specific cases may be difficult, viewing more particular statements of that standard as courts have applied it in various cases through the "best interests" lens is illuminating.

■     As we will discuss, our courts have articulated a general test to be applied in change of custody cases. However, the application of the test has proved to be difficult, and, at least on the surface, it appears that there have been some inconsistencies in the application of the legal standard. In Oregon, it appears that a noncustodial parent seeking a change of custody must satisfy what has evolved into a nominally two-part test. We say "nominally" because the first prong of the test—substantial change in circumstances— purportedly flows out of the second prong—best interests of the child. That is so because the view in Oregon historically has been that requiring a substantial change of circumstances as a threshold to a change in custody serves the best interests of all children because it promotes stability and discourages relitigation of custody, with its attendant distress for the children. *E.g.*, *Teel-King and King*, 149 Or App 426, 430, 944 P2d 323 (1997), *rev den*, 327 Or 82 (1998).[5]

The test to be applied in change of custody cases has been variously expressed, but its most recent iteration by the Supreme Court is as follows:

---

[5] As we explain below, there have been various indications in the cases about what the substantial change of circumstances must relate to and, because of that, we are not entirely certain of the parameters of the change of circumstances test in a "move away" case. Most recently, the cases seem to indicate that the change in circumstances must relate to the *capacity* of one of the parents to care for the child. Although the case law is somewhat unclear on this point, it would in some ways make sense to also consider changes in the children's own circumstances that might make a modification in custody in their best interests. It is not clear that a one-size-fits-all approach to even this first step of the analysis will always be in the best interests of each child. We further note that older Supreme Court cases expressed the test in the alternative, and it is not entirely clear to us that the court intended the switch to a two-part test. *See, e.g., Henrickson v. Henrickson*, 225 Or 398, 402-03, 358 P2d 507 (1961) (setting out both alternative and additive versions of the test). There are even some relatively recent cases in which the Supreme Court has suggested that the *only* consideration in relocation cases is whether the *move* (as opposed to the change in custody) would be in the best interests of the child, with no mention of change in circumstances. *Smith and Smith*, 290 Or 567, 571, 624 P2d 114 (1981); *Meier*, 286 at 446-48.

"A petitioner seeking a change of custody must show (1) that after the original judgment or the last order affecting custody, *circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed,* and (2) that considering the asserted change of circumstances in the context of all relevant evidence, it would be in the child's best interests to change custody from the legal custodian to the moving party."

*Ortiz*, 310 Or at 649 (footnote omitted; emphasis added). Several years later, the Supreme Court quoted that formulation of the standard in *State ex rel Johnson v. Bail*, 325 Or 392, 397, 938 P2d 209 (1997). Neither of those cases, however, was a case involving a proposed move by a custodial parent.

In the most recent case in which the Supreme Court addressed the prerequisites to a change of custody based on a move by the custodial parent, which was decided in 1961, the court stated the standard differently:

"Before any change in custody is made, it must be shown that, since the entry of the decree, there has been a change in *conditions affecting the welfare of the child,* and that the proposed change in custody would be for the child's best interests."

*Henrickson v. Henrickson*, 225 Or 398, 402, 358 P2d 507 (1961) (internal quotation marks omitted; emphasis added). At another place in *Henrickson*, the court put it as follows:

"In order to justify a modification for the care and custody of a minor child the petitioner is under the burden to show that it would enhance the welfare of the child, or *that the change in circumstances since the rendition of the last decree has been such as injuriously affected the child.*"

*Id.* at 403 (emphasis added).

We believe that the key to understanding how the court has variously stated the standard may lie in looking at the standard in terms of the asserted change in circumstances. In *Bail* and *Ortiz*, where the asserted change had to do with the behavior or temperament of the parents, it made sense to focus on changes in the capability to parent, *i.e.*, the way in which the asserted change might affect the best interests of the child. In *Henrickson*, where the asserted change

had to do with "external" circumstances, the court reasonably stated the standard more in terms of circumstances that might or might not affect the child's best interests.[6]

■ ■ Despite our uncertainty about the standard to be applied in a relocation case such as this, we believe that we are constrained to apply the most recently stated version of the appropriate analysis in a case involving a move by the custodial parent. Under the test, a court must first conclude that there has been a substantial change of circumstances in a party's capacity to parent before it may consider whether a change in custody would be in the best interests of the children. *Heuberger and Heuberger*, 155 Or App 310, 313, 963 P2d 153, *rev den*, 328 Or 40 (1998). We therefore first consider whether there has been a substantial change of circumstances in this case relevant to mother's or father's capacity to parent since the time that the first custody order was entered.

Father, as the party seeking the change of custody, "[has] the burden to show that there [has] been a substantial change of circumstances since the time of the original custody award." *Colson and Peil*, 183 Or App 12, 21, 51 P3d 607 (2002). Because father's motion was made "within a short time after the last custody decision, 'the asserted change of circumstances and detriment to the child must be more closely scrutinized by the court.' " *Heuberger*, 155 Or App at 314 (quoting *Atkinson and Atkinson*, 38 Or App 375, 379, 590 P2d 279, *rev den*, 286 Or 1 (1979)).

---

[6] Although we are constrained to apply the standard for change of circumstances that has been announced by the Oregon Supreme Court, we observe that adopting a standard for change of circumstances specific to relocation cases may be appropriate, given the unique issues that arise in these cases. In that vein, we note that the American Law Institute has offered a model rule that could help bring consistency to these cases by focusing on the actual (or attempted) involvement that a noncustodial parent has had with the children and the effect that the proposed move will have on that involvement:

> "The relocation of a parent constitutes a substantial change in circumstances * * * only when the relocation significantly impairs either parent's ability to exercise responsibilities the parent has been exercising or attempting to exercise under the parenting plan."

American Law Institute, Principles of the Law of Family Dissolution § 2.17(1), 354 (2002); *see also* Mitzi M. Naucler, *Relocation of Parents in Modification of Parenting Plans in Oregon*, 35 Willamette L Rev 585, 597-99 (1999) (recommending the adoption of the ALI model rules in Oregon).

As we have discussed above, cases involving a move by a custodial parent are highly fact dependent. It is clear that, under our case law, a move by a custodial parent does not automatically constitute a substantial change of circumstances for purposes of assessing a request for a change in custody. As noted above, under the Supreme Court's most recent case law, we must examine whether the move or proposed move by a custodial parent will have a significant adverse effect on one or both parents' capacity to care for the children. *Ortiz*, 310 Or at 649; *see also Colson*, 183 Or App at 21; *Dillard and Dillard*, 179 Or App 24, 31-32, 39 P3d 230, *rev den*, 334 Or 491 (2002).

Before the trial court,[7] father argued that mother's capacity to parent will be diminished by the proposed move because she will lose the assistance that both he and his family have provided in parenting the children. Father also argued that his capacity to parent will be seriously diminished because of the extreme distance between him and the children if mother does move to Holland.

The trial court agreed with father that the children's extended family was a benefit to the children and that moving away from father, A, and the extended family would be harmful to the children. Consistently with our case law, the trial court did not conclude that the move, in and of itself, constituted a substantial change of circumstances. Rather, the principal basis of the trial court's decision that there had been a substantial change of circumstances appeared to be that, without the close proximity of the extended family, father, and A, mother's ability to effectively meet the particular needs of these children would be diminished. The court stated:

> "I'm given the task of determining is this mother capable of parenting as well as she could with this move? And I say no. My finding is that she would not be as able to parent; that the network of family is such that I think she is better capable[.]

---

[7] As noted, father has not appeared on appeal. Accordingly, we must rely on the arguments that he made below.

"When we talk about extended family we cannot—and the non-custodial parent, we cannot take that out of the equation when we're talking about the network of support. We have kids that have special needs. We've got a very angry 16-year old who has not—Mom has not had the ability to parent, period.[8] I'm not saying she's a zero; I'm just saying that she could not function as a primary parent for that child, and that she will be less capable of parenting him as a non-custodial parent if she moves to Holland.

"We've got [P] who has special needs. And her ability to parent him here I think largely hinges on the rest of the framework that he has. And I think she's doing the best she can and I'm not critical of her ability to parent him here, but I don't believe she would be in a position, given new language, new schools, and a multitude of other things that are going to challenge any parent, and you've got a challenging child."

The trial court's reasoning appears to have been that mother would have less capacity to parent because she would face a greater challenge in helping P and R cope with their emotional difficulties without the extended family nearby.

For the reasons that we will discuss here and in our analysis of the children's best interests, we do not agree with the trial court that the evidence establishes that the move would have the significant negative effect on mother's parenting capacity that the trial court believed would occur. Consequently, we disagree with the trial court that father met his burden to show a substantial change in circumstances by establishing a change in mother's capacity to parent should she move to Holland. First, although there are general assertions in the evidence that the support that father and extended family members have given mother in her parenting role is helpful to her capacity to parent, there is no specific evidence establishing that fact nor is there any explanation of how the loss of that support would significantly undermine mother's parenting capacity. There may

---

[8] Because custody of A was not disputed at trial and no one disputes here that custody of A should remain with father, the court's findings with regard to mother's relationship with A is not pertinent to the issue here: namely, mother's parenting capacity with respect to P and R.

well be circumstances where the support of the custodial parent by the noncustodial parent, or others, is so extensive or important that the loss of that support would have a serious detrimental effect on the parenting capacity of the custodial parent. However, here, we have very little specific information as to the nature and extent of the role that these other persons play and, more importantly, we do not have any specific information or discussion of the connection, if any, between the role played by the extended family and mother's capacity to parent.

Father asserts generally that the support of family members has helped the children cope with the difficulties of dealing with the parents' dissolution. It is undoubtedly true that this support has been helpful, and, in an ideal world, this support would continue. Nonetheless, it does not automatically follow that, without this support, mother will be less capable as a parent or that she will no longer be able to adequately parent the children nor does the evidence establish anything of the sort. Father, having the burden to establish a change in mother's parenting capacity such as to constitute a substantial change of circumstances, has failed to meet that burden.

On the other hand, we do conclude that, under the particular facts here, father has established a substantial change in circumstances by showing that the move would have a detrimental effect on *his* capacity to parent. As mother correctly points out, under our case law, maintaining a close geographic relationship between the noncustodial parent and the children generally cannot be the controlling factor in cases involving moves by a custodial parent.[9] As we have previously explained, "[i]f maintaining a close geographic relationship with both parents were *controlling*, no primary parent would be allowed to move away over the objection of the other parent without losing custody of the child." *Duckett and*

---

[9] We note in this regard, however, that not all the cases are as distinct as they might be about whether such statements relate to the change in circumstances prong or the best interests prong of the analysis. *E.g.*, *Greene and Greene*, 107 Or App 338, 340, 812 P2d 11 (1991) ("A move out of state by a custodial parent, in and of itself, is not a change of circumstances sufficient to warrant changing custody, unless the move is shown to have had a significant adverse impact on the child."); *Padbury and Padbury*, 46 Or App 533, 536-37, 612 P2d 321 (1980) (same).

*Duckett*, 137 Or App 446, 449, 905 P2d 1170 (1995), *rev den*, 322 Or 644 (1996) (emphasis in original).

Here, however, the fact that mother proposes to move does not stand alone. Rather, other factors in this case convince us that the effect of the proposed move would sufficiently interfere with father's parenting capacity to constitute a substantial unanticipated change of circumstances. First, the change is substantial. Mother proposes to move thousands of miles away to a foreign country, which will make it impossible for father to have the regular weekly in-person contact with the children that he has been able to have since the dissolution and will make his opportunity to continue with his parenting role much more difficult. Second, the change is unanticipated. At the time of the dissolution hearing, although apparently mother had been traveling to Holland fairly extensively and had begun a relationship with her now fiancé, who lives in Holland, she had not indicated to father that she intended to move the children there. In fact, about a year before the hearing, she had told father that she intended that the children would not relocate to Holland because, at least at that time, she believed that it was too far away for them to be from father and extended family. Accordingly, we conclude that father has shown that circumstances relevant to his capacity to parent have changed sufficiently to establish a change of circumstances for purposes of his request for a modification of custody.

Because we conclude that father met his burden to establish a substantial change of circumstances, we must next consider whether father showed that it would be in the children's best interests to change custody from mother to father. For the reasons that we will explain, we conclude that father did not present sufficient evidence to support a change in custody. We hold that, based on the record before us, it is in the best interests of the children to remain with mother.[10]

---

[10] After hearing testimony from two witnesses, mother briefly and the custody evaluator extensively, the trial court stated,

"I don't want to prevent anybody from making their record, but I don't need to hear a lot from [father], I guess, is what I'm trying to say. I think that a lot was capsulized by the custody evaluator and my own sense of who these kids are and what their needs are and what would be in their best interest. So it's

ORS 107.137(1) sets out the pertinent factors that a court is to consider in making a custody determination:

"(a)   The emotional ties between the child and other family members;

"(b)   The interest of the parties in and attitude toward the child;

"(c)   The desirability of continuing an existing relationship;

"(d)   The abuse of one parent by the other;

"(e)   The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)   The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. * * *."[11]

---

more, I think, at this point, mother's concern about trying to convince me it's not in the best interest of the children to remain with their father here and change custody."

Although the trial court did not prevent any testimony from being elicited, the court's remarks could reasonably have been interpreted by the parties as suggesting that mother carried the laboring oar in the best interests analysis. That is incorrect. Alternatively, it strikes us as inappropriate to suggest that a noncustodial parent may meet the requirement to show that a change in custody is in the children's best interests without having testified about the nature of his or her relationship with the children and the other statutory factors. Although father did testify, he only very minimally discussed his relationship with the children and did not testify *at all* about his willingness to maintain the children's contact with mother should custody be changed, which is one of the statutory factors. ORS 107.137(1)(f).

[11] The factors set out in ORS 107.137(1) are undoubtedly relevant to the issues that arise in relocation cases. However, again because of the unique nature of relocation cases, it may be that adopting standards particular to these cases would be helpful predictors for parties and guidance for the trial courts. For example, one commentator has suggested that the following would be an appropriate list of factors:

"(1)   The prospective advantages of the move in improving the moving parent's and the child's quality of life;

"(2)   The integrity of the moving parent's motive of relocation, considering whether it is to defeat or deter visitation by the nonmoving parent;

"(3)   The integrity of the nonmoving parent's motives for opposing the move;

"(4)   Whether there is a realistic opportunity for visitation (parenting time) which can provide an adequate basis for preserving and fostering the nonmoving parent's relationship with the child if relocation is allowed, and the likelihood that each parent will comply with such alternative visitation;

None of the above factors is dispositive. ORS 107.137(2). However, we have noted that, as the statute provides, ORS 101.137(1)(e), consideration of which parent has been the primary caregiver to the children is a significant factor. *Holcomb and Holcomb*, 132 Or App 498, 503, 888 P2d 1046 (1995). We further note that three of the remaining five factors implicate consideration of the relative depth of the relationship between each parent and the children. ORS 101.137(1)(a)-(c). Accordingly, it is appropriate that our assessment of the best interests of these children focus on an examination of their relationships with both parents. That is not to say that there are no other relevant considerations, but only to recognize the fundamental importance of examining each parent-child relationship when confronting custody issues. *See Holcomb*, 132 Or App at 507 ("The continuity of a relationship is more beneficial to the best interests and welfare of the child than continuity of house and town.").

---

"(5) What was contemplated by the parties and the court at the time the original orders were entered;

"(6) The impact the relocation will have on the minor child;

"(7) The history of the relocating parent and the child's relationship;

"(8) The input from the attorney of the minor child;

"(9) The family relations report;

"(10) The cost of visitation, considering the distance between the two cities, the cost of travel, and the ease of travel;

"(11) What is in the best interests of the child? In determining quality of life, the courts look at

"(a) Emotional, physical and developmental needs of the children;

"(b) The children's opinion or preference as to where to live;

"(c) The extent to which the moving parent's income or employment will be enhanced;

"(d) The degree to which housing or living conditions would be improved;

"(e) The existence of educational advantages;

"(f) The quality of the relationship between the children and each parent;

"(g) The strength of the children's ties to the present community and extended family there; and

"(h) The likelihood that allowing or denying the move would antagonize hostilities between the two parties."

Linda D. Elrod, *Current Trends in Custody Relocation* 10-11 (written materials from ABA Council of Appellate Staff Attorneys Seminar, July 30, 2005; on file with Professor Elrod at Washburn University). *See also Baures*, 167 NJ at 116-17, 770 A2d at 229-30 (setting out factors specific to relocation cases); La Rev Stat Ann § 9:355.12 (same).

In this case, no one disputes that mother is and has always been the primary caregiver for P and R. The custody evaluator found mother to be the primary caregiver; she reported that collateral contact established that mother "has always met and exceeded their every need." The trial court observed that "there's no mistaking that she's the primary parent."

It is also undisputed that one of the children has some special needs. It is evident that P was having difficulties emotionally, academically, and socially at the time of trial. He has been diagnosed with attention deficit hyperactivity disorder (ADHD). The custodial evaluator testified that P struggled "with academics, behavior, peer relationships, communication skills and his emotional grounding."[12] She further noted that he was "not an adaptable child, and * * * does not have well developed self-coping mechanisms." The custody evaluator noted that mother recognizes P's special needs and has advocated for him in school.

It is evident from the record that mother has been the person who has been primarily meeting the needs of both children, especially P. As the custody evaluator reported and everyone seems to agree, mother has been the children's primary parent and, in that capacity, she has been the lead person dealing with all of their needs and difficulties. She has been required to, and did, address P's problems on a day-to-day basis. There is no question that mother has been the principal advocate for P in the school system and elsewhere. There is no evidence showing that father or anyone else has assumed this role except on a very occasional basis. At trial, mother's counsel questioned the custody evaluator about mother's involvement:

> "Q. [P] does have some special needs you've mentioned, and that seems quite obvious. You also mentioned that it was mother that was advocating for him in the school. Was anyone else advocating for him to help to take care of his needs?

---

[12] The evaluator testified that P's school counselor had said that P had "some odd * * * tics." Among other things, he "lies and steals from his classmates[,] * * * cries easily, has temper tantrums, whines and hides under his desk when he does not want to do something."

"A.   I'm not aware of that, no."

As discussed above, the evidence indicates that mother has considerable experience with and insight into the needs of P and R, has had the most experience addressing those needs, and has done so in an entirely satisfactory manner. Mother also has been extensively involved in the children's schools and in their extracurricular activities; in particular, the custody evaluator noted that mother had been a soccer coach and den leader for Boy Scouts. Although it is obvious that the children love both their parents, it is also apparent that mother is the primary emotional attachment for the children. Significantly, the record shows that, when P was upset in the middle of the night, it was mother, not father, with whom P would crawl into bed with for comfort. Although the custody evaluator testified that relocation to Holland could be a difficult adjustment for the children, she also predicted that if they were separated from mother, the children would go through a grieving process that could last for six months to five years.

Despite the uncontradicted evidence of the significant role that mother has played in these children's lives and the evidence that, although father is a caring parent, he has played a far more limited role in caring for the children's needs, the trial court concluded that custody must be changed to father if mother decides to move. The dissent agrees with that holding, relying principally on the custody evaluator's view that these are not "solid emotionally adaptable[,] flexible, resilient children" and that moving them from their current environment would be harmful to them. The dissent also concludes that we should defer to the trial court's holding because of its ability to observe the demeanor of the witnesses.

On this record, we reach a different conclusion than did the trial court for a number of reasons that we will explain. First, as discussed above, in the applicable statute, the legislature has directed us to consider a specific but limited group of factors in cases involving custody decisions:

"(a)   The emotional ties between the child and other family members;

"(b)    The interest of the parties in and attitude toward the child;

"(c)    The desirability of continuing an existing relationship;

"(d)    The abuse of one parent by the other;

"(e)    The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and

"(f)    The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."

ORS 107.137(1). As can be seen from the above language of the statute, the major focus in making custody decisions is to be on the extent and nature of the relationship between each parent and child. In fact, four of the above six factors implicate the relationship between each parent and the child about whom custody is disputed.

Our primary concern with the trial court's analysis is that it did not give sufficient weight to the evidence showing the nature and extent of the relationship of mother and father with these children. Rather, it reasoned that P and R are fragile children who are going through a difficult transition due to the dissolution of their parents' marriage, and, therefore, it must follow that it is in their best interests not to move even if that means being separated from their primary caregiver, mother.

In reaching that conclusion, the dissent, as did the trial court, fails to take into full account what the record shows as to the strength and significance of mother's role as a parent and the weakness and limitations of father's role. The trial court determined that, without the support of extended family members, mother's capacity to parent would be significantly reduced. We have a number of problems with that conclusion. First, as mentioned above, there is very little specific evidence about the role that other family members played in parenting the children. Apparently those family members did provide some daycare, but there is no specific evidence as to the extent or nature of their involvement. More importantly, there is no evidence concerning the effect on mother's parenting ability if the family involvement, such

as it is, was no longer available. The trial court essentially assumed that mother would somehow be less able to care for the children if this assistance were no longer available.

Further, underlying the trial court's as well as the dissent's conclusion is an additional assumption: namely, that father will be able to step into the role of the children's primary caregiver and be able to meet the children's special needs. That is a critical question here, and the evidence in this record simply does not support the conclusion that he will be able to do so. When the evidence regarding the nature and extent of the relationship of mother and father with the children is examined in light of the pertinent factors of the statute, it becomes apparent that it is in the best interests of these children to stay with mother, who as discussed in detail above always has been their primary parent and who has continuously demonstrated her ability to understand and meet these children's needs.

The evidence demonstrates that father has not been nearly as involved as mother in caring for the children and meeting their needs. Although he undoubtedly is a loving father, there is little in this record to indicate that he has had much experience at all meeting the needs of the children. There is also very little in this record to demonstrate that he has the ability to meet the children's special needs, especially those of P. For example, there is no evidence that father has ever advocated for P within the school system or regularly attended school meetings. Nor is there evidence that father has had extensive involvement with the children's extracurricular activities. The only specific evidence on this record pertaining to father's involvement is that he attended between five and seven soccer games during an academic year in which both his children played soccer, that father attended one school meeting for R's kindergarten, and that father "was there" after P changed schools after his parents separated.

There is, in fact, evidence that raises questions about father's ability to assume the role of primary parent and to meet the children's special needs. For example, mother told the custody evaluator that father has "poor follow-through with commitments to the children." There is

no evidence in the record to contradict that assertion. Further, mother's step-father testified that, "I don't see [father] getting ready to have his children. I don't see the consistency of wanting to be there to spend more time with * * * his kids" and that he has "not seen * * * him doing the things that are going to allow him to have that time to have his children and spend that time with him." We are concerned by that testimony, especially by the observation that mother's step-father does not see father "getting ready" for the children. We view it as significant that there is no evidence in the record, particularly from father, explaining what father is going to do to make the changes necessary in his life to take on the role of the primary caretaker of these children. His explanation of how he is going to care for the children consists of indicating that he has made arrangements for other family members to care for the children. Certainly, to justify removing these children from a primary parent who has ably performed that role, the other parent has some obligation to demonstrate the ability to assume that role.

Apparently the children's extended family would be available to offer some assistance to father in meeting the children's needs. It is often desirable to have such assistance from other family members in raising a child. That is a factor that weighs in father's favor. However, demonstrating that family members will assist in parenting is not a substitute for demonstrating that a parent has the ability to assume the role of primary caregiver. Further, the assistance of family members is only one factor to consider and does not by itself outweigh the more important consideration of the extent and nature of the relationship of each parent with the children.

There is no question that the proposed move will require adjustments by the children and could be upsetting to them. Any relocation of a child has the potential to be upsetting and requires adjustments. As the custody evaluator observed, "[P] does not want to be without his mother or his father." However, as discussed above, P's difficulties militate in favor of allowing him to stay with the parent who seems to best understand and has demonstrated the ability to meet his needs. Although it is clear that P is a child who finds change particularly difficult, it is far from clear that it would be easier for him to deal with the change of losing his

primary caregiver than to deal with the change of moving to Holland.

Our conclusion that it is in the best interests of these children to remain with their primary parent is further supported by evidence that mother's ability to meet the children's needs may, in fact, be enhanced by the move. Although mother has worked full time up until now, she testified that she plans to stay at home once she moves to Holland, because her fiancé has the financial means to support her and the children. This would allow her to provide the children with considerably more one-on-one time and would eliminate the need for them to be in daycare. The custody evaluator noted:

> "Mother recognizes that [A] and [P] both have some special needs. She has observed that [P] does better with one-on-one attention and focus. She has longed to give such attention to [P] for some time but has not been able to do so because she has always had to maintain full-time employment. The move to Holland would allow [P] and [R] to get the individual attention that they both need."

The custody evaluator testified that it "[a]bsolutely" would be a benefit for the children if mother had more time to devote to the children's needs. Further, mother has visited Holland and has assured herself that the educational opportunities for the children, especially for P and his special needs, would be better there. Mother seems to have focused on appropriate factors in reaching that conclusion, including the smaller class size and longer school year in Holland, the availability of special resources for P, and the fact that the teachers speak English, which will ease the children's transition.

Further, there is nothing in the record indicating that there were any concerns with respect to the children about mother's fiancé, Ritter, with whom the children would be living in Holland. The custody evaluator, who had interviewed him, said that he was a "warm, genuine, very nurturing type of person." From his testimony, it appears that he has affection for the children and likes being with them. He has thought about where the children would go to school and seems very receptive to building a positive relationship with father and doing all he can to help the children maintain a relationship with him.

It also appears that mother recognizes the importance of a continued close relationship between father and the children. ORS 107.137(1)(f). She has fully complied with the parenting plan in the original judgment. She also seems to have a positive attitude about facilitating as much contact as possible after the move, including phone calls, e-mail, and regular mailings. Moreover, she proposed that father have the children visit him for the entirety of all their school vacations, two weeks at Christmas and six weeks in the summer, and is willing to assume the burden of much of the cost of the children's travel. Mother also is receptive to any visits that father is able to make, noting that there is a direct flight to Amsterdam from Seattle and reporting that she had already told him that he could visit whenever he wanted to.[13] On the other hand, the only evidence in this record about father's willingness and ability to facilitate a close and continuing relationship with mother should custody be changed is the custody evaluator's statement that both parents are stable enough to facilitate a relationship with the other parent. As noted above, for whatever reason, father simply did not testify about any plans that he might have for facilitating the relationship between mother and the children, should he be given custody.

The conclusion that we reach on *de novo* review is of course contrary to the trial court's holding. We are reluctant to reach a conclusion contrary to that of the trial court. As noted above, the dissent asserts that the trial court found the custody evaluator's testimony to be persuasive and that we should accept the trial court's assessment because the court had the opportunity to observe and assess the demeanor of the custody evaluator. While we do give significant consideration to the trial court's assessment of an expert witness,

---

[13] We are not persuaded by the custody's evaluator's opinion that "there is some question as to the sincerity of Mother's commitment" to facilitating a good relationship between the children and father "due to the tremendous distance she desires to relocate * * *." It does not follow that, simply because a custodial parent wishes to move a large distance from a noncustodial parent, the custodial parent is not willing to facilitate a strong relationship between the children and the noncustodial parent. Other factors are relevant. For example, whether a custodial parent has a good reason for a move, and is not simply moving in order to inconvenience the noncustodial parent, should inform the issue. Also, as we note, the extent of thought that the custodial parent has given to maintaining the relationship and his or her history of facilitating the relationship are important.

such as a custody evaluator, as discussed above, on *de novo* review, we have an obligation to independently evaluate the persuasiveness of the expert's opinion.

Expert testimony, such as the testimony of the custody evaluator here, is a very important part of the record. Especially in this case, where so much of the record simply *is* the report of the custody evaluator, we must—and do—rely heavily on the information contained in the report. In fact, much of the information that we rely on regarding the parents' respective roles comes from the custody evaluator's report. However, a custody evaluator's ultimate recommendation is not necessarily determinative, even when it was accepted by the trial court. A custody evaluator's recommendation should always be *considered* by a court making a custody decision, as both we and the dissent do here. However, it is appropriate for a reviewing court to consider the recommendation in light of all of the evidence in the record, in particular the evidence from and about both parents and the children, as well as to take into account the expertise of the particular expert. Ultimately, the reviewing court must remain free to exercise its judgment based on all of the evidence in the record.

As noted, a necessary part of our assessment of the persuasiveness of a custody evaluator's recommendation is the particular expertise of that custody evaluator. The persuasiveness of a custody evaluator's recommendation, as with the recommendation of any expert, must depend, at least in part, on the particular expertise of the person making the recommendation. An important part of the expertise of any expert is the extent of his or her experience. Just as the opinion of a medical or any other kind of expert will be more persuasive if it comes from a person who is highly experienced in an area and has frequently dealt with the particular issue presented, the persuasiveness of an opinion of a person making a recommendation on the very difficult and critical question of the custody of a child will vary depending on the particular training and experience of the particular custody evaluator.

Here, as the trial court recognized, this evaluator has had fairly limited experience. At the time of the hearing,

she had been doing custody studies for only five months and apparently she had performed only two previous custody evaluations in circumstances involving a move. In addition, as with all evaluators, her exposure to this family was fairly limited. She apparently talked with mother and father and the children in person but all other contacts were made by telephone.

After reviewing all of the evidence in this record, we conclude that it is in the best interests of the children to remain in the custody of their primary caregiver, mother, even if she decides to move to Holland. Ideally, the children would have the benefit of an extensive and strong relationship with both parents and all of their extended family. As mentioned above, the effect on the noncustodial parent's involvement with his or her children makes this type of case one of the most difficult that this court must deal with. It is regrettable that father, who obviously loves his children and wishes to spend time with them, will be limited in his parenting time and that the children may suffer some detriment from the adjustments that they will need to make if they move with mother to Holland.

On balance, however, we believe that it is in the children's best interests to remain with mother. She has been their primary caregiver and she is the parent with whom they have the most extensive relationship. She has clearly demonstrated that she has the willingness and ability to meet all of their needs. In fact, because apparently it is likely that she will no longer be working if she decides to move, she may have more ability to meet their needs. Should mother decide to move, she has indicated that she will make sure that the children communicate often with father by e-mails and telephone and have as many visits as possible. Mother should make every effort to do so and to take other actions to ensure the continued relationship between father and the children. For all of the above reasons, on *de novo* review, we reverse the trial court's judgment ordering that custody be changed to father if mother should move to Holland. Because the trial court will need to craft a new parenting plan, we remand the case for that purpose.

Reversed and remanded.

**LANDAU, P. J.**, dissenting.

In *Meier and Meier*, 286 Or 437, 446, 595 P2d 474 (1979), the Oregon Supreme Court cautioned that "in making the determination of the best interests of the child, the trial judge is in a far better position to weigh the various factors which enter into the problem, and his [or her] decision should not lightly be disturbed by a court on appeal." We have echoed that same caution in any number of cases, particularly when a case presents a "close call." *See, e.g., Deffenbacher and Deffenbacher*, 168 Or App 331, 335, 5 P3d 1190 (2000); *Dominguez and Dominguez*, 154 Or App 430, 434, 961 P2d 906 (1998). Of course, that does not mean that trial courts have carte blanche in child custody cases, which, after all, are subject to *de novo* review. ORS 19.415(3). But it means that, if we are going to reverse a trial court, we should have some very good reasons to do so. In this case, there are no such good reasons.

The record consists primarily of the report and testimony of the custody evaluator, Bonnevier. The custody evaluator interviewed mother, father, the parties' three children, mother's fiancé, mother's sister, the paternal grandmother, a school counselor, a teacher, and family friends. She reviewed letters between the parties and various court orders and filings, as well as documents concerning school programs in Holland. She testified in some detail about her impressions of father, mother, the children, and the impact of the proposed move to Holland. In brief, she testified that both parents were loving, enthusiastic, and positive about the children. She testified that the children were very attached to their extended family, particularly the grandparents who had been caring for them on a full-time basis, as both parents worked.

Bonnevier concluded that separating the children from their father and the extended family "would be devastating for all of them." She said that the move to Holland would impose additional disruptions and stresses on the family that would require sound emotional stability and coping skills, stresses that she explained were of particular concern because "these are not flexible and adaptable children who

transition easily and look forward to big adventures or change." She explained that

> "relocation, albeit with the primary caregiver, would significantly harm the children and outweighs the harm to the children of divesting them [of] a daily relationship with their mother. They will need the support of extended family, friends, each other and familiarity, to have the best chance at adjusting to a positive and successful—to adjust in a positive and successful manner to their family's continuing transition."

Bonnevier acknowledged that mother was the primary caregiver and that mother intended to remain at home after the move overseas. She adhered to her recommendation, however, because of the special needs of the children, particularly P, who, she explained

> "definitely has some special needs that it does not sound like the school has fully recognized or addressed them in ways that could have been helpful had he gotten some help a few years back when Mom was advocating for him. [P]'s emotional being and his ability to communicate and make friendships, I think, is the main issue, that that is really going to affect his ability to adjust; his ability to go through the grief and loss process. He's not going to have anyone except Mom [and] Mom's fiancé. Although they're very supportive, he has those two people and his younger sister for the coping. And here he has a huge network to cope with the grief and loss."

The key consideration, she emphasized, was the fact of the fragility of the children and the fact that they are not strong, resilient, or emotionally adaptable.

Mother, her father, and mother's fiancé, Ritter, testified, albeit briefly. So far as I can tell, none contradicted anything that the custody evaluator said about the children, their special needs, or their relationships with their parents and their extended family.

At the conclusion of the testimony, the trial court announced its ruling with the following explanation:

> "I'm certainly willing to hear argument, but I have to say that this case is not a difficult one for me to decide.

"I believe that it's in the children's best interest that they remain in the Portland metropolitan area, and if that means changing custody in order to accomplish that, I would grant the father's motion to change custody.

"I can enumerate the reasons why. To begin with, the distance at which they would be from their now non-custodial parent, their father, would be extraordinary. Whether it's a nine-hour plane ride, and that's from Seattle which means leave here and go to the airport and hang out for an hour or two, and then go to Seattle and hang out for a little while, and presumably that's the easiest way to get there. I've certainly flown, myself, as an adult to Europe and found it to be extremely exhausting and taxing.

"So the extraordinary distance and the number of times per year they would have the opportunity to see their father, coming here from—because of their school schedules over there, would be insufficient in my estimation to sustain the relationship that they currently have. And I think it would be particularly detrimental to [P] to suffer an upheaval of that sort. There are so many reasons why [P] should not be moved. He has special needs which have been worked on and identified by the mother.

"I have no concern that Mr. Ritter would not be—I think he's an appropriate person; I think he has their best interests at heart. I certainly don't believe that we know everything there is in the United States about schooling kids, and they may have a superior system, certainly, and I'm approval—I have approval of the multi-language situation they have and the cultural exchange, and all of that I think would be enriching and wonderful, but that's not the most important thing for me to look at.

"I can look at a child who's already in trouble and has problems and issues and is not doing well, and I think it would certainly exacerbate that for him to be uprooted and moved to another country and have to not only make the emotional adjustment but have to learn a new language. He already has learning difficulties, the ADHD which apparently isn't being controlled by medication. It almost sounded like he was being described as having [Tourette's Syndrome], I don't know if they mentioned that, with the ticks and everything, but certainly there's some issues there. And that is not a child that should be moved. I'm not

sure he should even change schools or have too many disruptions.

"* * * * *

"I don't know what else I can say except that, like I said, this is not a difficult decision. I certainly don't want the children to lose their primary parent. But if it is your choice to move, then the children will be residing primarily with their father, and every time they have a visit—a vacation period, whether it be Christmas, spring break or summer, I would want them to have extended time with their mother."

In making its decision, the court expressly took into consideration the fact that Bonnevier's "experience as a custody evaluator is not as extensive as some people." The court explained that, even taking that into account, Bonnevier

"had a certain maturity and insight that was, I think, well beyond the years that she's been doing this sort of thing. And maybe it comes from her education; maybe it comes from her experience working in her other jobs along the way, but I certainly found her to be a very persuasive witness."

In my view, the trial court carefully and correctly resolved the question whether it is in the best interests of the children to move with their mother to Holland. The court's decision obviously was predicated, in significant part, on an evaluation of the demeanor of the witnesses, especially the custody evaluator. I can identify no good reason to second-guess that evaluation or the decision that resulted from it. Consistently with the caution that I quoted at the outset of this opinion that trial judges are in the best position to make such determinations, I would have affirmed the court's decision. In fact, I would have affirmed it without opinion. I find the majority's explanation for its decision to reverse the trial court unpersuasive, particularly in light of the custody evaluator's uncontroverted testimony about the children, their special needs, and the "devastating" consequences of moving to Holland—testimony that the trial court took such pains to emphasize was "very persuasive."

I respectfully dissent.